Stewart R. Pollock (SBN 301356)
spollock@edelson.com
Edelson PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9495

Stefan Coleman*
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, PLLC
201 South Biscayne Boulevard, 28th Floor
Miami, Florida 33131
Tel: 877.333.9427
Fax: 888.498.8946

**Pro hac vice* admission to be sought

*Attorneys for Plaintiff Holt and the Putative Classes*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTINE HOLT, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>FACEBOOK, INC., a Delaware corporation,<br><br>*Defendant* | CASE NO. 3:16-cv-02266-JST<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br>1. **Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227;**<br>2. **Violations of Cal. Bus. & Prof. Code §§ 17200,** *et seq*.<br><br>**CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

Plaintiff Christine Holt ("Holt") brings this First Amended Class Action Complaint and Demand for Jury Trial against Defendant Facebook, Inc. ("Facebook") to stop its practice of sending unsolicited text messages to the cellular telephones of consumers nationwide and to obtain redress for all persons injured by its conduct. Plaintiff, for her complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE ACTION

1. Defendant Facebook owns and operates four of the six most popular social networks in the world, including its flagship social network—www.facebook.com.[1]

2. Facebook relies almost exclusively on advertising services to generate revenue through its assortment of social media networks. In order to capitalize on these advertisements, Facebook collects and stores an array of user data, including the websites its users visit, the articles its users read, and its users' cellular telephone numbers.

3. Facebook then uses much of this information to deliver targeted ads to its user base. But Facebook also goes one step further and uses its members' cellular telephone information to send numerous unsolicited, generic text messages to thousands of cellular telephone numbers requesting that they interact with the social media platform, all without the consent of the recipients. Defendant sends these text messages using an automatic telephone dialing system that has the capacity to store and dial telephone numbers, automatically and *en masse*. Because these text messages were sent without the prior express consent of the text recipients, Defendant violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA").

4. The TCPA was enacted to protect consumers from unauthorized calls exactly like those alleged in this Complaint—autodialed solicitations to cellular phone numbers, placed without each consumer's prior express consent.

5. Defendant's violations caused Plaintiff and the members of the putative Classes of consumers (defined below) to experience actual harm, including the aggravation, nuisance, and invasion of privacy that necessarily accompanies the receipt of unsolicited text messages, as well as the automatic use of minutes and/or text messages on their cellular telephone plans.

6. In response to Defendant's unlawful conduct, Plaintiff filed the instant lawsuit, seeking an injunction requiring Defendant to cease all unsolicited text messaging and prevent similar conduct by Defendant in the future, as well as an award of statutory damages to the

---

[1] Matt Kapko, *15 Social networks with the most active users in 2015*, CIO (Dec. 11, 2015, 5:00AM), http://www.cio.com/article/3014362/social-networking/15-social-networks-with-the-most-active-users-in-2015.html (last visited July 22, 16).

members of the putative Classes under the TCPA, together with costs and reasonable attorneys' fees.

**PARTIES**

7. Plaintiff Christine Holt is a natural person domiciled in the District of Columbia.

8. Defendant Facebook is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1601 Willow Road, Menlo Park, California 94025. Defendant Facebook regularly does business throughout the State of California and in this District.

**JURISDICTION**

9. This Court has original jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 because they arise under the Telephone Consumer Protection Act, 47 U.S.C. § 227, which is a federal statute.

10. The Court has personal jurisdiction over Defendant and venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendant resides in this District and transacts significant business within this District. Furthermore, the conduct and events giving rise to Plaintiff's claims—including the development, execution, and approval of Facebook's marketing and advertising strategies and campaigns that led to the mass text messaging campaign at issue—occurred in and/or emanated from the State of California generally, and this District in particular.

**INTRADISTRICT ASSIGNMENT**

11. Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San Francisco Division.

**COMMON FACTUAL ALLEGATIONS**

*Facebook's Business Model*

12. Facebook is a global social network that enables people to connect, share, discover, and communicate with each other via their mobile devices and personal computers. Since its founding in 2004, Facebook has accumulated more than 1.5 *billion* users.

13. Each of these more than 1.5 billion users accesses Facebook for free. Facebook

doesn't charge its users for access or use of its services and even boasts that Facebook "I[s] free and always will be."[2] Instead of charging its user base for access, Facebook capitalizes on them by collecting their valuable personal information, including their geolocations, browsing histories and patterns, education, interests, and telephone numbers.

14. By expanding its user base and promoting user interaction, Facebook is able to expose more people to advertising—thereby increasing its own revenues.

15. Thus, any invitation to join, post a message to, or interact with Facebook is ultimately meant to promote its service and entice users to take an action that will result in a financial benefit to Facebook.

16. In order to increase consumer exposure to the advertisements hosted on its platform, Facebook relies on—and exploits—the massive database of consumer information that it collects from its users.

*Facebook's Unsolicited Text Messages*

17. Facebook exploits its vast cache of personal information through the tried and true method of mobile marketing. Specifically, Facebook sends automated text messages to the cellular telephone numbers it collects from its users' accounts.

18. However, in doing so, Facebook fails to update its databases to account for circumstances where its users have deactivated or relinquished the phone number that they previously provided to the social media service.

19. Cellular telephone subscribers deactivate and relinquish their cellular telephone numbers for a variety of reasons. Once deactivated, the cellular telephone carrier reassigns the number to another subscriber—a practice known as "recycling." Recycling times (i.e., the time between deactivation and reassignment) vary across carriers, and generally range from thirty days to six months depending on location and demand. During the recycling period, the cellular telephone number is considered disconnected.

20. Relevant here, when a Facebook user deactivates their phone number, and the

---

[2] *See* Facebook, https://www.facebook.com/ (last visited July 22, 16).

number eventually gets reassigned to a new consumer, Facebook continues to send multiple automated text messages to the same number, and its new owner, without the new owner's consent.

21. In some instances (but not all), the prior owner of a recycled telephone number may have provided Facebook with their telephone number, or even consented to receiving text messages from Facebook. However, regardless of any consent provided by the prior owner, that consent cannot be transferred to the new owner. Ultimately, new owners of recycled cellular telephone numbers are given no choice in receiving (and paying for) Facebook's unsolicited text messages. This is especially true because Facebook does not provide a method for opting out within the text messages themselves and individuals cannot change any settings in Facebook accounts that do not belong to them.

22. The mobile marketing industry is acutely aware of cellular telephone number recycling and, in particular, the risk associated with sending text messages to non-consenting recycled numbers. For example, the Mobile Marketing Association ("MMA") publishes specific guidelines based on accepted industry practices for all mobile marketers. In its October 2012 U.S. Consumer Best Practices for Messaging, the MMA recommends that mobile marketers, like Facebook,

> …have appropriate and effective systems and processes for managing deactivation and recycled number information. These systems and processes should be designed to ensure that mobile content programs subscribed to by previous holders of a specific phone number do not continue to be delivered or billed to a subsequent holder of that number when it is reassigned.

The MMA further advises mobile marketers to "process deactivation information within three business days of receipt."[3]

23. Moreover, numerous commercially available services exist to help mobile marketers, such as Facebook, identify and exclude recycled numbers and non-consenting cellular subscribers

---

[3] The MMA is a global trade organization that issues codes of conduct, best practices, guidelines, rules and instructions for companies engaged in mobile marketing. Its U.S. Consumer Best Practices for Messaging are based on accepted industry practices, common wireless carrier policies and regulatory guidance. *See U.S. Consumer Best Practices for Messaging*, Mobile Marketing Association (Oct. 16, 2012), *available at* http://www.ctia.org/docs/default-source/default-document-library/industry-best-practices.pdf?sfvrsn=0 (last visited July 22, 16).

from their texting campaigns. These services identify disconnected numbers before they are recycled and alert mobile marketers that any consent associated with those telephone numbers in the past had been terminated.

24. Despite these standard industry guidelines and practices, and other available resources available to it, Facebook failed (and continues to fail) to take the necessary steps to ensure that its automated text messages are sent only to consenting recipients. That is true even though Facebook knows its automated system sends unsolicited text messages to individuals about accounts that don't belong to them.

25. To that end, Facebook simply treats the new recycled cellular telephone number owner as if he or she were the previous owner. If the previous owner gave consent to receive Facebook's text messages, Facebook continues to treat that consent as valid. Facebook then sends multiple text messages to the new owner's cellular telephone without their consent. New owners are then forced to incur the cost and invasion of privacy that stem from receiving Facebook's unauthorized text messages.

26. Notably, new owners are not provided any explicit means to contact Facebook to make the messages stop within the text messages themselves. In some instances, the messages do not even identify "Facebook" as the sender, and some consumers—having no prior relationship with Facebook—may be completely unaware that Facebook is the sender.

27. If the telephone number is associated with its previous owner's online Facebook account, the new cellular subscriber has no way of accessing that account (belonging to the previous owner) to opt out of receiving Facebook's text messages. And, worse yet, Facebook often ignores direct demands from the text recipients that the text messages stop.

28. Ignoring consumer demands that the texts cease is particularly easy for Facebook because it makes it notoriously difficult for consumers to opt-out of or unsubscribe from its texting campaigns.

29. In fact, Facebook fails to provide *any* information or instruction in its text messages informing the recipients how to make the text messages stop.

30. Because consumers are not provided sufficient information to make Facebook's text messages cease, they often reply with repeated—and ignored—demands that Facebook stop sending the unlawful messages.

31. Any stop request sent by a consumer is, by design, sent to Facebook's short code 32665, directly informing Facebook (as intended) that any subsequent messages are unauthorized.

32. The internet is replete with consumer complaints arising from Facebook's texting campaign originating from the "32665" number. (*See* Figures 1–5.)



(Figure 1.)[4]



(Figure 2.)

---
[4] Figures 1–3 are just a few examples of the hundreds of consumer complaints regarding Facebook's conduct available on a single website. *See* http://whocallsme.com/Phone-Number.aspx/32665 (last visited July 22, 16). Likewise, Figures 4–5 are representative of a sampling of the numerous complaints available at another website. *See* https://www.everycaller.com/phone-number/3-2665/ (last visited July 22, 16).



(Figure 3.)



(Figure 4.)



(Figure 5.)

33. The text messages, however, are not simply sent to individuals who never provided consent. They are also completely automated, generic in nature, and sent as a result of inactivity (if anything) rather than in response to a particular event or human intervention.

34. By way of example, one of the most common unsolicited text messages sent from Facebook states: "What are you up to? Reply with a status update to post to Facebook…" In fact, numerous individuals complain of receiving the *same language*.[5]

---

[5] *See* http://whocallsme.com/Phone-Number.aspx/32665100/3 (last visited July 22, 16) ("I have received countless text messages from this number asking me "what are you up to? Reply with a satus [sic] update to post to Facebook"); ("I have received 100's of messages from this number asking me "What are you up to?" It is annoying. I have tried replying to it but am not sure if that does anything. It is refer [] me to answer on Facebook, so I am not sure if they are involved. Does anyone know how to stop this."); ("Strange text message and I have no idea who sent it. The

35. Another example of the generic text messages sent by Facebook includes: "Your friends have posted [a number of] updates this week. Reply to post your own status on Facebook…." (*See* ¶ 45, below.) This sample text message, however, does not provide the number or identity of "friends" who posted the so-called status updates. Instead, the text message is merely sent to induce the cellular phone owners to update *their own* statuses.

36. These text messages are not personal. They do not identify an individual by name, are not sent to notify the recipient that attention is needed or that someone is trying to contact them, and are not requested by the recipient or triggered by a particular event. Instead, numerous individuals all receive the same or similar text messages repeatedly, suggesting that they are more random and harassing than directed and calculated.

37. Additionally, no human interaction was required to send the text messages. No Facebook friends requested that the recipients update their status or inputted their cellular phone numbers prompting the text messages, and the cellular phone owner did not engage in activity that would otherwise prompt the text messages. If anything, it is the absence of interaction and activity that prompts the text messages, not a triggered event.

38. The text messages are prepopulated with the same language created by Facebook, sent to numerous individuals at once, and encouraged the recipients to engage the social media platform.

39. The process for sending the text messages is simple: Facebook acquired cellular phone numbers, stored them in a database, and utilized a program to dial and send prepopulated messages to the stored telephone numbers—*en masse*—without any human intervention. In other

---

message said: What are you up to? Reply with a status update to post to Facebook or go to https://fb.com/l/28tr3HlvMuqbPo."); ("Get the same message every day as a text message uses up my minutes"); *see also* http://whocallsme.com/Phone-Number.aspx/32665100/4 (last visited July 17, 2016) ("I keep getting text messages asking what I'm up to and to update by Facebook page through an attached hyperlink. I've texted back: take my number off the list, I'll report you if you don't take my number off the list…. and im [sic] still getting the same message. I've gotten three more since I've texted!").

words, the text messages are sent using equipment that had the capacity to store or produce telephone numbers, and to dial such numbers, *en masse*, without any need for human intervention.[6]

40. Despite knowing that its text messages violate the TCPA, Defendant continues to send thousands of text messages to recycled numbers without the text recipients' consent. Facebook's ongoing text messaging is hardly surprising given that each text message sent by Facebook has the potential to directly increase its advertising revenues.

41. The TCPA was enacted to give consumers control over how and where they receive calls and text messages. When Facebook's text messages are sent to consumers without their consent, it fails to address or respect the limitations imposed by the TCPA, thereby stripping control from consumers and violating the spirit and letter of the TCPA.

**FACTS SPECIFIC TO PLAINTIFF CHRISTINE HOLT**

42. Plaintiff Christine Holt is the subscriber to and primary user of her personal cellular telephone number.

43. In or around March 2016, Plaintiff obtained a new cellular telephone number from MetroPCS. Almost immediately after obtaining her new cellular phone number, Plaintiff began receiving impersonal, promotional text messages. The messages were identified cryptically from "32665" and "32665025" which Plaintiff later learned were short codes owned and/or operated by Facebook.

44. Beginning in March of 2016 and continuing through April 2016, Plaintiff Holt received multiple text messages from 32665025, asking her to post status updates to Facebook. For example, on April 17, 2016, Plaintiff received the following unsolicited text messages:

---

[6] Facebook's exact dialing system is unknown at this time. With 1.5 billion users, it's clear that a human is not sending text messages on behalf of Facebook, but rather that a dialing system is used to automatically send these text messages to multiple individuals at once.



(Figure 6.)

45. The website "http://fb.com," in turn, redirects visitors to www.facebook.com. On or about April 13, 2016, Plaintiff replied to Defendant's text messages with multiple written demands that Facebook stop texting her—but Defendant disregarded these demands and continued to send unsolicited text messages to Plaintiff, including as recently as April 20, 2016.

46. Plaintiff is not a www.facebook.com user and never provided her prior express consent for Facebook to contact her. She did not express an interest in receiving information about Facebook to any person or entity, including Defendant.

47. Plaintiff did not provide her phone number to Defendant or any third party operating on its behalf, let alone provide her consent to receive text message calls from, or on behalf of, Facebook.

48. Defendant, or others acting on its behalf, sent these text messages to Plaintiff and thousands of members of the putative Classes using equipment that has the capacity to store or produce telephone numbers to be called and to dial such numbers, *en masse*, simultaneously and without human intervention.

49. As such, Defendant not only failed to obtain Plaintiff's consent when it began barraging her cellular telephone number with text messages, but it was also expressly informed that she did not consent to the text messages through her demands that they stop. Thus, it was clear that any consent it could have had (it didn't have any) was revoked. Despite her efforts, the harassing text messages continued.

50. As a result of Facebook's conduct, Plaintiff lost money or property in the form of consumed battery life and diminished use, enjoyment, and utility of her cellular telephone and cellular telephone plan.

## CLASS ALLEGATIONS

51. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and two Classes of similarly situated individuals, defined as follows:

> **No Consent Class**: All persons in the United States who: (1) received a text message call initiated by Defendant; (2) at his or her cellular telephone number; and (3) for which Defendant did not have any current record of prior express consent from him or her to place such text message calls at the time the text message calls were placed.
>
> **Stop Text Class**: All persons in the United States who: (1) received a text message call initiated by Defendant; (2) at his or her cellular telephone number; (3) *after* making an express request to Facebook for the text messages to cease, other than a final one-time confirmation text message confirming the recipient's desire to not receive such messages.

52. The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

53. **Numerosity**: The exact size of each Class is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief,

Defendant has sent text messages to thousands of consumers who fall into the definitions of the Classes. Members of the Classes can be identified through Defendant's records.

54. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Classes in that Plaintiff and the members of the Classes sustained damages arising out of Defendant's uniform wrongful conduct.

55. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex class actions. Plaintiff has no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff.

56. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

**No Consent Class**:

(a) Whether Defendant's text messages were sent to consumers' cellular telephones utilizing an automatic telephone dialing system;

(b) Whether Defendant maintains records of prior express consent to place the text messages it sent to consumers;

(c) Whether Defendant's conduct violated the TCPA; and

(d) Whether Plaintiff and the members of the No Consent Class are entitled to statutory and treble damages based on the willfulness of Defendant's conduct.

**Stop Text Class**:

(a) Whether Defendant's text messages were sent to consumers' cellular telephones utilizing an automatic telephone dialing system;

(b) Whether Defendant continued to send messages to the Stop Text Class's cellular telephones after receiving a request that the text messages cease;

(c) Whether Defendant's conduct violated the TCPA;

(d) Whether Plaintiff and the members of the Stop Text Class are entitled to statutory and treble damages based on the willfulness of Defendant's conduct.

57. **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. Joinder of all parties is impracticable, and the damages suffered by the individual members of the Classes will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Classes to obtain effective relief from Defendant's misconduct. Even if members of the Classes could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be fostered, and uniformity of decisions ensured.

**FIRST COUNT**
**Violation of the TCPA, 47 U.S.C. § 227**
**(On behalf of Plaintiff and the No Consent Class)**

58. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

59. Defendant and/or its agents sent unsolicited text messages to cellular telephone numbers belonging to Plaintiff and the members of the No Consent Class without their prior express consent.

60. Defendant sent the text messages, or had them sent on its behalf, using equipment that stored cellular telephone numbers in a database and dialed them without any human intervention and/or that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers, *en masse*.

61. These text messages were sent to Plaintiff and other members of the No Consent Class simultaneously and without human intervention.

62. By sending or having these unsolicited text messages sent to Plaintiff and the No Consent Class, Defendant has violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's unlawful conduct, the members of the No Consent Class suffered actual damages in the form of monies paid to receive the unsolicited text messages on their cellular telephones and, under 47 U.S.C. § 227(b)(3)(B), are each entitled to, *inter alia*, a minimum of $500.00 in damages for each such violation of the TCPA.

63. Should the Court determine that Defendant's conduct was willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(b)(3)(C), treble the amount of statutory damages recoverable by Plaintiff and the other members of the No Consent Class.

**SECOND COUNT**
**Violation of the TCPA, 47 U.S.C. § 227**
**(On behalf of Plaintiff and the Stop Text Class)**

64. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

65. Defendant and/or its agents sent unsolicited text messages to cellular telephone numbers belonging to Plaintiff and the other members of the Stop Text Class after Plaintiff and the members of the Class had communicated to Defendant that they no longer wished to receive text messages from Defendant.

66. As such, Facebook did not have the required prior express consent of the text message recipients at the time the text messages in question were sent.

67. Defendant sent the text messages, or had them sent on its behalf, using equipment that stored cellular telephone numbers in a database and dialed them without any human

intervention and/or that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers, *en masse*.

68. These text messages were sent to Plaintiff and other members of the Stop Text Class simultaneously and without human intervention.

69. By having these unsolicited text messages sent to Plaintiff and the Stop Text Class, Defendant has violated 47 U.S.C. § 227(b)(1)(A)(iii). As a result of Defendant's unlawful conduct, the members of the Stop Text Class suffered actual damages in the form of monies paid to receive the unsolicited text messages on their cellular phones and, under 47 U.S.C. § 227(b)(3)(B), are each entitled to, *inter alia*, a minimum of $500.00 in damages for each such violation of the TCPA.

70. Should the Court determine that Defendant's conduct was willful and knowing, the Court should, pursuant to 47 U.S.C. § 227(b)(3)(C), treble the amount of statutory damages recoverable by Plaintiff and the other members of the Stop Text Class.

### THIRD COUNT
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(On Behalf of Plaintiff and the Classes)**

71. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

72. California's Unfair Competition Law ("UCL"), Cal Bus. & Prof. Code §§ 17200, *et seq.*, prohibits any unlawful, unfair, or fraudulent business act or practice. A business practice need only meet one of these three criteria to be considered unfair competition.

73. As described herein, Facebook has engaged in unfair and unlawful business practices as defined by the UCL by sending, or having sent on its behalf, text messages to cellular telephone numbers utilizing an automated telephone dialing system without the prior express consent of the called parties, or by having such text messages sent to cellular telephone numbers after receiving demands that it cease sending such text messages, in violation of 47 U.S.C. § 227(b)(1)(A)(iii).

74. Defendant knew that it used automated telephone dialing equipment to send text messages to cellular telephone numbers belonging to Plaintiff and the members of the Classes.

75. Defendant violated the UCL's unfair prong and caused substantial injury to consumers by knowingly accessing their cellular telephone equipment without consent, thereby consuming battery life and diminishing their use, enjoyment, and utility of their cellular telephones and cellular telephone plans. The injuries caused by Defendant's unfair conduct are not outweighed by any countervailing benefits to consumers or competition, and the injuries are such that consumers themselves could not have reasonably avoided them.

76. Defendant has also violated the UCL's unlawful prong by violating the TCPA, as described above.

77. Defendant's unlawful and unfair conduct occurred during attempts to induce consumer use of, and participation in, its social media network in order to generate advertising revenues for itself, and therefore occurred in the course of Defendant's business practices.

78. Defendant's unfair and unlawful conduct directly and proximately caused Plaintiff and members of the Classes a loss of money or property in the form of the wear and tear on their cellular telephone equipment, consumed battery life, and the diminishment of the use and enjoyment of their plans.

79. Facebook's critical decisions related to the text messaging campaign at issue were coordinated in, occurred in and emanated from its headquarters in California.

80. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order (1) requiring Defendant to cease the unfair and unlawful practices described herein; (2) requiring Defendant to restore to Plaintiff and each member of the Classes any money acquired by means of unfair and/or unlawful competition (restitution); and, (3) awarding reasonable costs and attorneys' fees pursuant to Cal. Code Civ. Proc. § 1021.5.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Christine Holt, individually and on behalf of the Classes, prays for the following relief:

A. An order certifying the Classes as defined above, appointing Plaintiff Christine Holt as the representative of the Classes, and appointing her counsel as Class Counsel;

B.   An award of actual and statutory damages;

C.   An order declaring that Defendant's actions, as set out above, violate the TCPA;

D.   A declaratory judgment that Defendant's telephone calling equipment constitutes an automatic telephone dialing system under the TCPA;

E.   An order declaring that Defendant's actions, as set out above, violate the UCL;

F.   An order requiring Defendant to disgorge any ill-gotten funds acquired as a result of its unlawful telephone calling practices;

G.   An order requiring Defendant to pay restitution for the money and property lost as a result of its unlawful telephone calling practices;

H.   An order requiring Defendant to identify any third party involved in the text messaging activities as set out above, as well as the terms of any contract or compensation arrangement it has with such third parties;

I.   An injunction requiring Defendant to cease all unsolicited text message activities and otherwise protecting the interests of the Classes;

J.   An injunction prohibiting Defendant from using, or contracting the use of, an automatic telephone dialing system without obtaining and maintaining records of call recipients' prior express consent to receive calls made with such equipment;

K.   An injunction prohibiting Defendant from conducting any future telemarketing activities until it has established an internal Do Not Call List as required by the TCPA;

L.   An award of reasonable attorneys' fees and costs; and

M.   Such other and further relief that the Court deems reasonable and just.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

| | | |
|---|---|---|
| 1 | | Respectfully submitted, |
| 2 | Dated: July 22, 16 | **CHRISTINE HOLT**, individually and on behalf of all others similarly situated, |
| 3 | | By: /s/ Stewart R. Pollock |
| 4 | |       One of Plaintiff's Attorneys |
| 5 | | Stewart R. Pollock (SBN 301356) spollock@edelson.com |
| 6 | | Edelson PC 123 Townsend Street, Suite 100 |
| 7 | | San Francisco, California 94107 Tel: 415.212.9300 |
| | | Fax: 415.373.9495 |
| 8 | | |
| 9 | | Stefan Coleman* law@stefancoleman.com |
| 10 | | LAW OFFICES OF STEFAN COLEMAN, PLLC 201 South Biscayne Boulevard, 28th Floor |
| 11 | | Miami, Florida 33131 Tel: 877.333.9427 |
| 12 | | Fax: 888.498.8946 |
| 13 | | * *Pro hac vice* application to be filed. |

## CERTIFICATE OF SERVICE

    I, Stewart R. Pollock, an attorney, hereby certify that on July 22, 2016, I caused to be served the above and foregoing ***First Amended Class Action Complaint*** by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the court's CM/ECF electronic filing system, on this the 22nd day of July, 2016.

                                          /s/ Stewart R. Pollock