1  Stewart Pollock (SBN 301356)
   spollock@edelson.com
2  Edelson PC
   123 Townsend Street, Suite 100
3  San Francisco, California 94107
   Tel: 415.212.9300
4  Fax: 415.373.9495

5  Benjamin H. Richman (Admitted *Pro Hac Vice*)
   brichman@edelson.com
6  Courtney C. Booth (Admitted *Pro Hac Vice*)
   cbooth@edelson.com
7  EDELSON PC
8  350 North LaSalle Street, 13th Floor
   Chicago, Illinois 60654
9  Tel: 312.589.6370
   Fax: 312.589.6378
10

11 Stefan Coleman*
   law@stefancoleman.com
12 LAW OFFICES OF STEFAN COLEMAN, PLLC
   201 South Biscayne Boulevard, 28th Floor
13 Miami, Florida 33131
   Tel: 877.333.9427
14 Fax: 888.498.8946

15 * *Pro Hac Vice* admission to be sought

16 *Attorneys for Plaintiff Holt and the Putative Classes*

17

18                    **UNITED STATES DISTRICT COURT**

19                   **NORTHERN DISTRICT OF CALIFORNIA**

20                       **SAN FRANCISCO DIVISION**

21 CHRISTINE HOLT, individually and on behalf of a      CASE NO.: 3:16-cv-02266-JST
   class of similarly situated individuals,
22                                                       **PLAINTIFF'S OPPOSITION TO**
                              Plaintiff,                 **DEFENDANT'S MOTION TO DISMISS**
23                                                       **FIRST AMENDED COMPLAINT**
                          v.
24                                                       Judge:  Jon S. Tigar
   FACEBOOK, INC.,                                       Date:   October 25, 2016
25                                                       Time:   9:30 a.m.
                              Defendant.
26

27

28

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     FACTUAL BACKGROUND ..............................................................................3

III.    ARGUMENT ......................................................................................................4

      A.      Plaintiff Has Sufficiently Pleaded a Violation of the TCPA ..........................4

            1.      The allegations in the FAC plausibly demonstrate that Facebook used an ATDS to send the text messages at issue ...................5

            2.      Plaintiff plausibly alleges that the text messages were sent *en masse* without human intervention ...............................10

      B.      The TCPA Does Not Violate the First Amendment ..........................13

            1.      Facebook's text messages plainly constitute commercial speech ........14

            2.      The TCPA is not a content-based regulation ...................15

            3.      The TCPA survives both intermediate and strict scrutiny .................18

      C.      Plaintiff States a Claim Under Both the Unlawful and Unfair Prongs of the UCL ..............................................................................19

            1.      Plaintiff has standing to pursue her UCL claim because the text messages diminished the use, enjoyment, value, and utility of her cellular telephone and cellular telephone plan ......................................20

            2.      Plaintiff states a claim under the UCL's "unlawful" prong because she has plausibly alleged violations of the TCPA...............................22

            3.      Plaintiff states a claim under the UCL's "unfair" prong because the text messages violate the policies underling the TCPA, and the harm they caused outweighs their benefits............................................22

IV.     CONCLUSION ................................................................................24

# TABLE OF AUTHORITIES

**UNITED STATES SUPREME COURT CASES:**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................................4

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)..................................................................................................4

*Bolger v. Youngs Drug Prods. Corp.,*
    463 U.S. 60 (1983)..................................................................................................14

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
    447 U.S. 557 (1980)................................................................................................15

*Members of City Council of L.A. v. Taxpayers for Vincent,*
    466 U.S. 789 (1984)................................................................................................17

*New York v. Ferber,*
    458 U.S. 747 (1982)................................................................................................13

*N.Y. St. Club Ass'n v. City of New York,*
    487 U.S. 1 (1988)..................................................................................................13

*Pleasant Grove City v. Summum,*
    555 U.S. 40 (2009)................................................................................................17

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015)......................................................................................16, 17

*Rust v. Sullivan,*
    500 U.S. 173 (1991)................................................................................................17

*United States v. Salerno,*
    481 U.S. 739 (1987)................................................................................................13

*Wash. St. Grange v. Wash. St. Republican Party,*
    552 U.S. 442 (2008)................................................................................................13

*Williams-Yulee v. Fla. Bar,*
    135 S. Ct. 1656 (2015)......................................................................................18, 19

**UNITED STATES COURTS OF APPEALS:**

*Bland v. Fessler,*
    88 F.3d 729 (9th Cir. 1996) ..................................................................................16

*Cahaly v. Larosa,*
    796 F.3d 399 (4th Cir. 2015) ................................................................................18

*Cahill v. Liberty Mut. Ins. Co.,*
    80 F.3d 336 (9th Cir. 1996) ....................................................................................4

*Charles v. City of Los Angeles*,
679 F.3d 1146 (9th Cir. 2012) ................................................................ 14

*Cutting v. City of Portland*,
802 F.3d 79 (1st Cir. 2015) .............................................................. 13-14

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) ................................................................ 24

*Destination Ventures, Ltd. v. FCC*,
46 F.3d 54 (9th Cir. 1995) ...................................................................... 15

*Doe v. United States*,
58 F.3d 494, 497 (9th Cir. 1995) ............................................................ 25

*Gomez v. Campbell-Ewald Co.*,
768 F.3d 871 (9th Cir. 2014) .......................................................... 15, 18

*In re First All. Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) .......................................................... 20, 23

*Legal Aid Servs. of Ore. v. Legal Servs. Corp.*,
608 F.3d 1084 (9th Cir. 2010) ................................................................ 13

*Lozano v. AT&T Wireless Servs. Inc.*,
504 F.3d 718 (9th Cir. 2007) ................................................................. 20

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) ................................................................. 16

*Moser v. FCC*,
46 F.3d 970 (9th Cir. 1995) ........................................................... 15, 18

*Rubio v. Capital One Bank*,
613 F.3d 1195 (9th Cir. 2010) ............................................................... 23

*Satterfield v. Simon & Schuster, Inc.*,
569 F.3d 946 (9th Cir. 2009) ................................................................. 24

*Van Bergen v. Minnesota*,
59 F.3d 1541 (8th Cir. 1995) ......................................................... 17, 18

*Wolfson v. Concannon*,
811 F.3d 1176 (9th Cir. 2016) ............................................................... 18

**UNITED STATES DISTRICT COURT CASES:**

*Abbas v. Selling Source, LLC*,
No. 09-cv-3413, 2009 WL 4884471 (N.D. Ill. Dec. 14, 2009) ................... 15-16

*Brown v. Collections Bureau of Am., Ltd.*,
--- F. Supp. 3d ---, 2016 WL 1734013 (N.D. Cal. May 2, 2016) ........................ 8

*Brown v. Hain Celestial Grp., Inc.*,
No. 11-cv-03082, 2015 WL 3398415 (N.D. Cal. May 26, 2015) ..................... 20

*Derby v. AOL, Inc.*,
  No. 15-v-00452, 2015 WL 3477658 (N.D. Cal. June 1, 2015) ........................................6

*Drew v. Lexington Consumer Advocacy, LLC*,
  No. 16-cv-00200, 2016 WL 1559717 (N.D. Cal. Apr. 18, 2016)..............................10, 22

*Duguid v. Facebook, Inc.*,
  No. 15-cv-00985, 2016 WL 1169365 (N.D. Cal. Mar. 24, 2016) .................................1, 4

*Fields v. Mobile Messengers Am., Inc.*,
  No. 12-cv-05160, 2013 WL 6774076 (N.D. Cal. Dec. 23, 2013).....................................6

*Frederico v. Overland*,
  No. 12-cv-2588, 2013 WL 5516187 (N.D. Cal. Oct. 4, 2013) .......................................22

*Gragg v. Orange Cab Co., Inc.*,
  942 F. Supp. 2d 1111 (W.D. Wash. 2013)........................................................................8

*Gragg v. Orange Cab Co., Inc.*,
  995 F. Supp. 2d 1189 (W.D. Wash. 2014)......................................................................13

*Gragg v. Orange Cab Co., Inc.*,
  No. 12-cv-0576, 2013 WL 195466 (W.D. Wash. Jan. 17, 2013) .................................7, 8

*Gresham v. Rutledge*,
  --- F. Supp. 3d ---, 2016 WL 4027901 (E.D. Ark. July 27, 2016) ...................................18

*Haghayeghi v. Guess?, Inc.*,
  No. 14-cv-00020, 2015 WL 1345302 (S.D. Cal. Mar. 24, 2015)..................................6, 9

*Harnish v. Frankly Co.*,
  No. 14-cv-02321, 2015 WL 1064442 (N.D. Cal. Mar. 11, 2015) ..........................5, 9, 12

*Hartless v. Clorox Co.*,
  No. 06-cv-2705, 2007 WL 3245260 (S.D. Cal. Nov. 2, 2007)..................................22, 24

*Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*,
  No. 14-cv-0437, 2014 WL 5812294 (N.D. Cal. Nov. 7, 2014) .......................................14

*In re Adobe Sys., Inc. Privacy Litig.*,
  66 F. Supp. 3d 1197 (N.D. Cal. 2014) ......................................................................23, 24

*In re Anthem, Inc. Data Breach Litig.*,
  No. 15-md-02617, 2016 WL 589760 (N.D. Cal. Feb. 14, 2016)......................................24

*In re Ferrero Litig.*,
  794 F. Supp. 2d 1107 (S.D. Cal. 2011)...........................................................................24

*In re Google, Inc. Privacy Policy Litig.*,
  No. 12-cv-01382, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013)................................20, 21

*In re iPhone Application Litig.*,
  6 F. Supp. 3d 1004 (N.D. Cal. 2013) ..............................................................................22

*In re Jiffy Lube Int'l, Inc.*,
      847 F. Supp. 2d 1253 (S.D. Cal. 2012) .................................................................9

*Jenkins v. LL Atlanta, LLC*,
      No. 14-cv-2971, 2016 WL 1029524 (N.D. Ga. Mar. 9, 2016) ...............................9

*Kazemi v. Payless Shoesource, Inc.*,
      No. 09-cv-5142, 2010 WL 963225 (N.D. Cal. Mar. 16, 2010) ...............................6

*Knutson v. Reply!, Inc.*,
      No. 10-cv-1267, 2011 WL 291076 (S.D. Cal. Jan. 27, 2011) .................................9

*Kramer v. Autobytel, Inc.*,
      759 F. Supp. 3d 1165 (N.D. Cal. 2010) .................................................................5

*L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*,
      114 F. Supp. 3d 852 (N.D. Cal. 2015) ..................................................................14

*Lozano v. Twentieth Century Fox Film Corp.*,
      702 F. Supp. 2d 999 (N.D. Ill. 2010) ...................................................................15

*Maier v. J.C. Penny Corp.*,
      No. 13-cv-0163, 2013 WL 3006415 (S.D. Cal. June 13, 2013) .........................5, 9

*McKenna v. WhisperText*,
      No. 14-cv-00424, 2015 WL 428728 (N.D. Cal. Jan. 30, 2015) ............................13

*Meyer v. Bebe Stores, Inc.*,
      No. 14-cv-00267, 2015 WL 431148 (N.D. Cal. Feb. 2, 2015) ...............................6

*Murfitt v. Bank of Am. NA*,
      No. 13-cv-01182, 2013 WL 7098636 (C.D. Cal. Oct. 22, 2013) ..........................23

*Nunes v. Twitter, Inc.*,
      --- F. Supp. 3d ---, 2016 WL 3660526 (N.D. Cal. July 1, 2016) ...............8, 11, 12

*Olmos v. Bank of Am., N.A.*,
      No. 15-cv-2786, 2016 WL 3092194 (S.D. Cal. June 1, 2016) .................5, 9, 22

*Patriotic Veterans, Inc. v. Indiana*,
      --- F. Supp. 3d ---, 2016 WL 1382137 (S.D. Ind. Apr. 7, 2016).........................18

*Perkins v. LinkedIn Corp.*,
      53 F. Supp. 3d 1222 (N.D. Cal. 2014) ..................................................................15

*Pietzak v. Microsoft Corp.*,
      No. 15-cv-5527, 2015 WL 7888408 (C.D. Cal. Nov. 17, 2015) ..........................21

*Sherman v. Yahoo! Inc.*,
      150 F. Supp. 3d 1213 (S.D. Cal. 2015).............................................................6, 11

*Silver v. Penn. Higher Edu. Assistance Agency*,
      No. 14-cv-0652, 2016 WL 128629 (N.D. Cal. Mar. 31, 2016) ...........................17

*Thomas v. Dun & Bradstreet Credibility Corp.*,
        100 F. Supp. 3d 937 (C.D. Cal. 2015) ............................................................21

*Thomas v. U.S. Bank Nat'l Assoc.*,
        No. 14-cv-2705, 2015 WL 12434361 (S.D. Cal. Nov. 20, 2015)......................23

*Tyacke v. First Tennessee Bank, N.A.*,
        No. 16-cv-228 (C.D. Cal. 2016) .......................................................................21

*Van Patten v. Vertical Fitness Grp., LLC*,
        22 F. Supp. 3d 1069 (S.D. Cal. 2014) ..............................................................21

*Weisberg v. Stripe, Inc.*,
        No. 16-cv-00584, 2016 WL 3971296 (N.D. Cal. July 25, 2016) ......................13

*Williams v. T-Mobile USA, Inc.*,
        No. 15-cv-03384, 2015 WL 5962270 (N.D. Cal. Oct. 14, 2015) ........................9

*Wreyford v. Citizens for Transp. Mobility, Inc.*,
        957 F. Supp. 2d 1378 (N.D. Ga. 2013) ........................................................15, 16

**STATE SUPREME COURT CASES:**

*Kasky v. Nike, Inc.*,
        45 P.3d 243 (Cal. 2002) ....................................................................................19

*Kwikset Corp. v. Superior Court*,
        246 P.3d 877 (Cal. 2011) ..............................................................................20, 21

**STATUTES:**

28 U.S.C. § 2342(1) ..................................................................................................13

47 U.S.C. § 227 ............................................................................................... *passim*

Cal. Bus. & Prof. Code §§ 17200, *et seq.* .................................................1, 19, 20, 22

Pub. L. No. 102-243, §§ 2 *et seq.* .............................................................................19

**MISCELLANEOUS:**

FCC Omnibus Order (2015) ......................................................................................10

FTC, Text Message Spam, http://www.consumer.ftc.gov/articles/0350-text-message-spam .......21

Plivo, https://www.plivo.com/sms-short-code/...........................................................9

## I.   INTRODUCTION

Defendant Facebook, Inc. ("Facebook") sent Plaintiff Christine Holt ("Plaintiff" or "Holt")—and thousands of other consumers—text messages from its short codes that invited her to increase her posting and overall interaction on its popular social networking platform. Plaintiff and the putative class members, however, never provided their cellular phone numbers to Facebook and never consented to receive text messages from it. As a result, Facebook violated two laws: (1) the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), which prohibits anyone from using an automatic telephone dialing system ("ATDS") to call an individual's cellular phone unless the caller has the recipient's prior express consent; and (2) California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), which prohibits unfair, deceptive, or unlawful acts in commerce and allows any person who loses money or property as a result to bring suit.

Facebook now seeks dismissal of Plaintiff's First Amended Complaint ("FAC") in its entirety, raising three primary arguments in support: (1) that Plaintiff's TCPA claim fails because she did not adequately plead its use of an ATDS and this Court's order in *Duguid v. Facebook, Inc.*, No. 15-cv-00985, 2016 WL 1169365 (N.D. Cal. Mar. 24, 2016), requires dismissal; (2) that (contrary to Ninth Circuit precedent) the TCPA violates the First Amendment to the United States Constitution; and (3) that Plaintiff's UCL claim fails because she supposedly did not suffer an injury or adequately allege unfair or unlawful conduct as required. Each of these arguments fails.

As an initial matter, Facebook's reliance on the *Duguid* matter is misplaced. While the actions are similar because the proposed classes overlap to some extent, the content of the text messages at issue and the context for their transmission could not be more different. As it relates to content, Holt alleges Facebook sent her and other class members text messages encouraging them to use the platform and seeking their patronage, whereas the text messages in *Duguid* were sent to inform individuals that someone had logged into an account associated with their phone numbers (and going so far as to identify the system used to access the individuals' accounts). As it relates to the context of the text messages, Holt alleges that the messages in this case were "triggered" by an individuals' passive inactivity, whereas in *Duguid* they were sent to the phone number associated with a Facebook account at the moment someone logged into that particular account. In other words,

the text messages in this and the *Duguid* matters are entirely different both in substance and circumstance, and the Court's order in *Duguid* does not require dismissal of this case as well.

Reliance on *Duguid* aside, Facebook argues that Plaintiff's TCPA claim must fail because she can't establish that the text messages were sent using an ATDS. That argument fails for two reasons. First, the entirely generic content of the messages (inviting individuals to interact with the social media platform), the context in which they were sent (that there was no triggering event, but rather, a supposed lack of activity that prompted the sending to all previously stored numbers), and the fact that the same text messages were sent from Facebook's same short codes to thousands (if not millions) of other individuals readily support Holt's contention that it uses an ATDS. And second, the text messages did not require human intervention, as they were not prompted by a particular event, did not require an individual to initiate their sending in any way, appear to have been sent to numerous individuals at the same time and from the same short codes, and there is no evidence (or allegation) in the record at this point to suggest that there was any human intervention whatsoever.

Facebook next argues that even if the text messages are considered unlawful, the TCPA violates the First Amendment because the texts are not commercial speech, the TCPA is a content-based restriction, and, because it is content-based, it is subject to strict scrutiny. Facebook is wrong here as well. The texts are commercial speech, as they relate to Facebook's product and seek to increase user activity and with it, revenue. The TCPA is also not content-based, as it restricts *all* calls made by an autodialer and its few exceptions relate only to emergencies or instances in which the recipient has a relationship with the caller such that no privacy interest would likely be violated (i.e., where consent to receive the messages exists). And because it is not content-based, the TCPA is subject to intermediate scrutiny, which the Ninth Circuit has already held the TCPA passes.

Finally, Facebook argues that Plaintiff cannot bring a claim under the UCL because she does not have standing, her supposed failed TCPA claim cannot support her "unlawful" claim, and she does not sufficiently allege that the harm of the text messages outweighs their utility to prevail on an "unfairness" claim. Those arguments likewise fail. First, Holt has standing because she alleges that she suffered an economic injury in the form of consumed battery life and diminishment of her use, enjoyment, and utility of her cell phone and cell phone plan, which courts in this Circuit have held is

1   more than enough in the context of an underlying TCPA claim. Next, because Plaintiff adequately

2   alleges a claim for violation of the TCPA, her claim under the UCL's "unlawful" prong survives.

3   And, because Facebook's text messages violate the privacy interest Congress sought to protect in

4   enacting the TCPA, Holt adequately alleges her claim under the "unfair" prong as well.

5           For these reasons, and as explained further below, each of Facebook's arguments fails.

6   Accordingly, Plaintiff respectfully requests that the Court deny Facebook's motion in its entirety.

7   **II.      FACTUAL BACKGROUND**

8           Facebook, the company and namesake behind the globally recognized social network,

9   provides its platform free of cost to its 1.5 billion users. (FAC ¶¶ 12-13.) Because it doesn't charge

10  users, Facebook has to rely on other sources to generate revenue—namely, capitalizing on its vast

11  compilation of user data. (*Id.* ¶¶ 2, 13.) Facebook thereby leverages its users' personal information to

12  profit from a variety of advertising and marketing techniques. (*Id.* ¶¶ 14-17.) One way that Facebook

13  derives revenue is through its use of automated text messages. (*Id.* ¶ 17.) The problem with sending

14  these sorts of text messages is a common one: Facebook fails to update its databases to account for

15  circumstances where its users have deactivated or relinquished the phone number that they

16  previously provided to the social media service. (*Id.* ¶ 18.) As a result, the new owner of a recycled

17  cellular telephone number becomes the recipient of Facebook's unsolicited text messages, without

18  ever having given Facebook consent to receive them. (*Id.* ¶ 21.) Compounding the problem, the only

19  way individuals can stop the messages is by logging into another person's Facebook account (which

20  is generally impossible), as the text messages themselves provide no avenue for opting out in the

21  future (e.g., like allowing for a "STOP" response as similar messages so often do). (*Id.*)

22          The text messages at issue are automated, generic messages encouraging the recipients to

23  engage the platform. (*Id.* ¶ 33.) They were not sent in response to a particular event, but rather as a

24  result of *inactivity.* (*Id.* ¶ 33.) For example, one of the most common messages sent by Facebook

25  reads: "What are you up to? Reply with a status update to post to Facebook[.]" (*Id.* ¶ 34.) These text

26  messages are not personal; rather, numerous individuals receive the same or similar text messages

27  repeatedly. (*Id.* ¶ 35.) Facebook utilizes a software program to dial and send prepopulated messages

28

*en masse* to cellular telephone numbers stored in a database, all without any human intervention (as that term is understood under the TCPA). (*Id.* ¶ 39.)

Plaintiff Holt is one cellular phone user who received unsolicited text messages from Facebook after she obtained a new cell phone with a recycled number in March 2016. (*Id.* ¶ 43.) Holt never provided her express consent for Facebook to contact her. (*Id.* ¶ 46.) And while she sent text messages in response requesting that it stop, Facebook disregarded her requests and continued sending her messages. (*Id.* ¶ 45.) Accordingly, Plaintiff brought the instant action on behalf of herself and the two classes she seeks to represent, alleging violations of the TCPA and the UCL.

## III.   ARGUMENT

A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Detailed factual allegations are not required, and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating a Rule 12(b)(6) motion, a court accepts as true all allegations of material fact and construes them in the light most favorable to the plaintiff. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 338 (9th Cir. 1996).

### A.   Plaintiff Has Sufficiently Pleaded a Violation of the TCPA.

Facebook first asks the Court to dismiss Plaintiff's TCPA claim because she supposedly failed to sufficiently plead facts suggesting its use of an ATDS, but that argument is based on two false premises: (i) that the content of the messages, the context in which they were received, and the existence of similar messages would suggest an ATDS was *not* used; and (ii) that Plaintiff's allegations show the text messages could not have been sent without human intervention. (Def.'s Mot. to Dismiss ("Mot.") at 8-15.) In making these arguments, Facebook merely recycles its arguments from *Duguid*—another case involving text messages to recycled numbers[1]—in an attempt

---

[1]    The plaintiff in *Duguid* filed an amended complaint, which Facebook likewise moved to dismiss. That motion is currently pending before the Court. *See Duguid*, No. 15-cv-00985, Dkt. 65 (N.D. Cal. May 26, 2016).

---

1    to distract the Court from the significant differences in the allegations. Each of these arguments

2    plainly ignores the language of Plaintiff's FAC and, therefore, lacks merit.

3              **1.    The allegations in the FAC plausibly demonstrate that Facebook used an
                       ATDS to send the text messages at issue.**

4

5              The TCPA defines an ATDS as "equipment which has the capacity—(A) to store or produce

6    telephone numbers to be called, using a random or sequential number generator; and (B) to dial such

7    numbers." 47 U.S.C. § 227(a)(1). A plaintiff may plausibly allege the use of an ATDS through either

8    (1) minimal allegations about the equipment used, or (2) more detailed allegations about the "call"

9    itself "that would lead to the inference that an ATDS was used." *Olmos v. Bank of Am., N.A.*, No.

10   15-cv-2786, 2016 WL 3092194, at *2 (S.D. Cal. June 1, 2016) (citing *Maier v. J.C. Penny Corp.*,

11   No. 13-cv-0163, 2013 WL 3006415, at *3 (S.D. Cal. June 13, 2013)); *see also Kramer v. Autobytel,*

12   *Inc.*, 759 F. Supp. 3d 1165, 1171 (N.D. Cal. 2010). Plaintiffs may "rely on indirect allegations, such

13   as the content of the message, the context in which it was received, and the existence of similar

14   messages, to raise an inference that an ATDS was utilized" because "[p]rior to initiation of

15   discovery, courts cannot expect more." *Olmos*, 2016 WL 3092194, at *2 (internal quotation

16   omitted); *Harnish v. Frankly Co.*, No. 14-cv-02321, 2015 WL 1064442, at *3 (N.D. Cal. Mar. 11,

17   2015) (recognizing courts frequently rely on indirect details because they are mindful of "the

18   difficulty a plaintiff faces in knowing the type of calling system without the benefit of discovery.")

19   (internal quotations omitted). For instance, facts showing that the challenged message was generic or

20   impersonal, requested a "YES" response, was sent *en masse*, or was sent from an SMS short code,

21   are all indicative of a message transmitted via an ATDS. *Harnish*, 2015 WL 1064442, at *3.

22             Here, Holt has plausibly alleged that Facebook used an ATDS to send the text messages

23   under both approaches. Under the first, Holt alleges that the messages were sent from short codes

24   owned and/or operated by Facebook and "using equipment that stored cellular telephone numbers in

25   a database and dialed them without any human intervention and/or that had the capacity to store or

26   produce telephone numbers to be called using a random or sequential number generator, and to dial

27   such numbers, *en masse*." (FAC ¶¶ 43, 60.) Plaintiff further alleges that while the exact nature of

28   Facebook's dialing system is unknown to her at this time, it is clear that a human is not sending text

PLAINTIFF'S OPPOSITION TO              5              CASE NO. 3:16-cv-02266-JST
DEFENDANT'S MOTION TO DISMISS

messages to Facebook's 1.5 billion users. (*Id.* ¶ 39 n.6.) Additionally, there can be no real argument that human intervention is required, because the text messages are sent in response to inactivity, not a particular event. (*Id.* ¶ 33.) Those allegations alone are enough to infer that Facebook sent the text messages via an ATDS. *See Sherman v. Yahoo! Inc.*, 150 F. Supp. 3d 1213, 1217-19 (S.D. Cal. 2015) (denying summary judgment because jury could infer that automated welcome message was sent without human intervention and was not "triggered" by user); *Fields v. Mobile Messengers Am., Inc.*, No. 12-cv-05160, 2013 WL 6774076, at *3 (N.D. Cal. Dec. 23, 2013) (evidence that defendant's "equipment has the capacity to send millions of texts per month and that the temporal manner in which the texts were sent indicates that human agency was not involved.").[2]

With respect to the second approach, Holt first alleges that the content of the messages (e.g., "What are you up to? Reply with a status update to post to Facebook" and "Your friends have posted [a number of] updates this week. Reply to post your own status on Facebook…."), was generic and boilerplate in nature. Indeed, there are numerous public complaints about other individuals having received the very same messages. (*Id.* ¶¶ 32-34; 34 n.5.) The messages do not include any personally identifying information and, instead, are nonspecific requests that an individual interact with its platform (a way for Facebook to increase its revenue) sent from Facebook's short codes. (*Id.* ¶¶ 43-44.) Formulaic messages like these are regularly found sufficient to infer the use of an ATDS. *See Meyer v. Bebe Stores, Inc.*, No. 14-cv-00267, 2015 WL 431148, at *4 (N.D. Cal. Feb. 2, 2015) (allegations that included "the full text of the message, which appears to be a form message" sufficiently pleaded use of an ATDS); *Haghayeghi v. Guess?, Inc.*, No. 14-cv-00020, 2015 WL 1345302, at *3 (S.D. Cal. Mar. 24, 2015) (holding use of ATDS could be inferred from facts showing defendant sent generic, impersonal advertising messages via SMS short code; *Kazemi v. Payless Shoesource, Inc.*, No. 09-cv-5142, 2010 WL 963225, at *2 (N.D. Cal. Mar. 16, 2010) ("description of the received messages as being formatted in SMS short code licensed to defendants,

---

[2]     These allegations also differentiate this case from those relied upon by Facebook, where personalized text messages were composed and sent by users themselves. *See, e.g.*, *Derby v. AOL, Inc.*, No. 15-v-00452, 2015 WL 3477658, at *4 (N.D. Cal. June 1, 2015) ("the system alleged in the complaint . . . sends texts only at the direction of AIM users, and which contain personalized messages composed by such users.").

1    scripted in an impersonal manner and sent en masse supports a reasonable inference that the text

2    messages were sent using an ATDS.").

3          Despite the plainly generic nature of these text messages—and recognizing that the messages

4    themselves contain generic elements (Mot. at 9)—Facebook argues that they were "personalized"

5    because they contain information relating to account activity and, thus, the Court cannot infer that

6    the text messages were sent *en masse* through an ATDS. (*Id.* at 9-11) (arguing the messages were

7    targeted because the text messages about friend updates "explicitly reference a specific number of

8    friends (e.g., "7") who engaged in a specific activity (e.g., "post…updates") within a specific

9    timeframe (e.g., "this week").") This argument is nonsensical. The text messages were not

10   "specific"—they in no way identified the recipient (i.e., "Christine" or "Holt" or any combination of

11   the two) and they weren't otherwise tailored for any one individual, let alone Plaintiff. And in the

12   certain instances in which Facebook "informed" the recipients that their "friends" (i.e., individuals

13   who weren't actually their "friends") had posted status updates, there was nothing in the text

14   messages that identified who those friends were, what they posted, or why their activity necessitated

15   that recipients interact with Facebook.[3] For all intents and purposes, these messages could have been

16   sent to every phone number associated with an account holder that had at least seven friends. Thus,

17   unlike in *Duguid*, the text messages did not specifically inform Holt of activity related to her

18   supposed actions and were not necessitated by another's conduct. Separately, even if the text

19   messages did include "personalized information," that "does not immunize [them] from scrutiny."

20   *See Gragg v. Orange Cab Co.*, No. 12-cv-0576, 2013 WL 195466, at *3 n.3 (W.D. Wash. Jan. 17,

21   2013) ("the inclusion of personalized information in a…text message does not immunize it from

22   scrutiny under the TCPA. Programs capable of merging a list of consumer names or other

23   identifying information with a boilerplate message are commonplace. The issue is whether the

24   allegations . . . taken as a whole and including the nature of the communication, give rise to a

25   plausible belief that the message was sent using an ATDS.").[4] Nothing within the content of the text

26   messages, therefore, suggests anything other than that they were entirely generic.

27
      ---
      [3]    Defendant's argument that these text messages are specific would essentially void the TCPA
28   as every text message is sent to a particular phone number and includes a specific request.
      [4]    The court in *Gragg* ultimately found that the plaintiff failed to allege facts sufficient to lead

---

Next, the context of the text messages also sufficiently infers they were sent via ATDS. For all Plaintiff knows (or for what she could know), Facebook either sent them at random or programmed its dialers to send them after a certain period of inactivity. Unlike in *Duguid*, the text messages were not prompted because the recipient signed into an account. They also were not the result of a request by any of the recipients to receive them, were not caused by an individual inviting the recipients to join an application, and were not sent in response to any sort of triggering event (except maybe Facebook's continuous desire that individuals interact with it). *See Nunes v. Twitter, Inc.*, --- F. Supp. 3d ---, 2016 WL 3660526, at *3 (N.D. Cal. July 1, 2016) (new owner of a recycled cellular phone number cannot know if, to whom, or when text messages based on former owner's social media account will be sent); *contra Gragg*, 2013 WL 195466, at *3 (dismissing but granting leave to amend where allegations tended to show that plaintiff received a "personal and individual response to a request for a taxi."). And, again, in situations where Facebook informed recipients that their "friends" had posted, none of those "friends" had requested that the recipients interact with them or the social media platform in a way that would initiate such messages.[5] Thus, the context strongly supports an inference that the messages were sent via ATDS.

Furthermore, there are numerous online complaints regarding the same boilerplate messages, which suggest that the messages were transmitted *en masse* and by a machine that would send text messages to stored numbers—i.e., an ATDS. (*Id.* ¶¶ 32-34; 34 n.5); *see also Gragg v. Orange Cab Co., Inc.*, 942 F. Supp. 2d 1111, 1114-15 (W.D. Wash. 2013) ("The allegation that defendants sent at least tens of thousands of text messages containing substantially the same marketing message, taken as true, supports the inference that defendants used an ATDS because the large number of sent text messages is plausibly beyond what 'human agency' could produce."); *Brown v. Collections Bureau of Am., Ltd.*, --- F. Supp. 3d ---, 2016 WL 1734013, at *2 (N.D. Cal. May 2, 2016) (finding that,

---

to an inference that an ATDS was used, but granted leave to amend because additional allegations could change that conclusion. *Gragg*, 2013 WL 195466 at *3. Here, Plaintiff pleads sufficiently more detail regarding her receipt of Facebook's text messages, which plausibly leads to an inference that an ATDS was used. See Sec. III.A.1, supra.

[5]    Further, the idea that a person could be in charge of identifying the number of "friends" who posted status updates or kept track of an individual's interaction with the social media platform is absurd. There can be no question, therefore, that the machine utilized to send the text messages was programmed to contact stored numbers from a database.

along with other allegations, references in plaintiff's complaint to internet complaints by third persons about calls from the same phone number supported the inference that an ATDS was used).

Finally, the messages were transmitted via the SMS short codes "32665" or "32665025." (*Id.* ¶¶ 31, 43.) Such codes are typically used to transmit a high volume of impersonal messages to a large swath of recipients, *see, e.g.*, Plivo, https://www.plivo.com/sms-short-code/ (last visited Sep. 8, 2016) (noting "SMSes are sent out at a default base rate of 40 per second," with higher transmission rates available); *Jenkins v. LL Atlanta, LLC*, No. 14-cv-2791, 2016 WL 1029524, at *4 (N.D. Ga. Mar. 9, 2016) (noting companies use short codes "to communicate with large numbers of consumers"), and often indicate use of an ATDS. *See Haghayeghi*, 2015 WL 1345302, at *4 (alleged use of short code supported inference of an ATDS); *Olmos*, 2016 WL 3092194, at *2 ("The FAC alleges generally that Bank of America sent these text messages using an [ATDS]…The FAC also alleges factual support for this allegation, stating that the messages were completely identical; they both were sent from '345-22,' which suggests the use of an ATDS; and they ended with the wording 'Reply STOP to end texts.'…All of these facts support Plaintiff's conclusory allegations that an ATDS was used, and sufficient indirect allegations allow discovery to proceed on this issue.").

Construing all of these facts in the light most favorable to Plaintiff, as the Court must, the FAC undoubtedly supports the reasonable inference that an ATDS was used.[6] *See Harnish*, 2015 WL 1064442, at *3 (plaintiff plausibly alleged ATDS by including "the short code from which the message was transmitted, and the content of the message"); *Maier*, 2013 WL 30006415, at *4 (plaintiff plausibly alleged ATDS by describing "the specific content of the text message and the number from which it was received"); *In re Jiffy Lube Int'l, Inc.*, 847 F. Supp. 2d 1253, 1260 (S.D. Cal. 2012) (finding it was sufficient for a plaintiff to "state[] that they received a text message from an SMS short code and that the message was sent by a machine with the capacity to store or produce

---

[6]     The cases relied upon by Facebook in support of its argument suggest no different result. *See Williams v. T-Mobile USA, Inc.*, No. 15-cv-03384, 2015 WL 5962270, at *3 (N.D. Cal. Oct. 14, 2015) (vaguely alleging the "frequency and pattern" of the calls suggested that an ATDS was used, but provided no other facts about their content or the use of an SMS short code to make her claim plausible); *Knutson v. Reply!, Inc.*, No. 10-cv-1267, 2011 WL 291076, at *2 (S.D. Cal. Jan. 27, 2011) (alleging calls received "were solicitations about Defendant's real estate business," but providing no facts "allow[ing] the court to infer the calls were randomly generated or impersonal.").

1  random telephone numbers" because "[w]hile additional factual details about the machines might be

2  helpful, further facts are not required to move beyond the pleadings stage.").[7]

3      **2.    Plaintiff plausibly alleges that the text messages were sent *en masse*
            without human intervention.**

4

5      Facebook also seemingly argues that Plaintiff's TCPA claim must fail because (i) equipment

6  that stores telephone numbers and dials them is not an ATDS if individuals provide their numbers, as

7  it must randomly or sequentially generate the numbers called, and (ii) the text messages at issue

8  were sent only after a series of "steps" that required human interaction. Both of those arguments fail.

9      First, Congress intended the definition of an ATDS to be understood broadly to encompass

10  equipment whose "basic functions . . . are to dial numbers without human intervention and to dial

11  thousands of numbers in a short period of time." FCC Omnibus Order (2015) ¶¶ 15-17. Despite this

12  clear intent, Facebook argues that regardless of whether equipment can store and dial telephone

13  numbers to be called, it can only be characterized as an ATDS if it has a "random or sequential

14  number generator," because "[t]he key consideration is the absence of human intervention in the

15  selection of numbers to be dialed."  (Mot. at 12.) The FCC, however, expressly *rejected* the

16  argument that "the term 'capacity' [to randomly or sequentially generate telephone numbers] implies

17  present ability rather than future possibility," and "reiterate[d] that a present use or present capacity

18  test could render the TCPA's protections largely meaningless by ensuring that little or no modern

19  dialing equipment would fit the statutory definition of an autodialer." FCC Order at ¶ 20. Thus, there

20  can be no question that equipment does not need to actually randomly or sequentially generate

21  telephone numbers in order to constitute an ATDS. *Drew v. Lexington Consumer Advocacy, LLC*,

22  No. 16-cv-00200, 2016 WL 1559717, at *5 (N.D. Cal. Apr. 18, 2016) ("[A] system need not actually

23  store, produce, or call randomly or sequentially generated telephone numbers, it need only have the

24  capacity to do it."). But even if it did, and without the benefit of discovery, Plaintiff alleges that the

25

26  _____
    [7]     Facebook's argument against categorizing the text messages as telemarketing or advertising
    is irrelevant to whether Plaintiff adequately pleaded the use of an ATDS. (*See* Mot. at 11.) The
27  TCPA explicitly restricts the placement of "*any call* (other than a call made for emergency purposes
    or made with prior express consent of the called party) using any automatic telephone dialing
28  system[.]" 47 U.S.C. § 227(b)(1)(A) (emphasis added). Thus, with regards to the use of an ATDS,
    whether the text messages are properly labeled advertisements is inapposite.

PLAINTIFF'S OPPOSITION TO                              10                    CASE NO. 3:16-cv-02266-JST
DEFENDANT'S MOTION TO DISMISS

1    equipment used by Facebook had the capacity (whether present or future) to do so, and that it

2    regularly dialed numbers *en masse* that were stored within its system. (FAC ¶¶ 3, 39, 48, 60, 67.)

3         Facebook's argument that human intervention was required also fails. (Mot. at 12-13.) Here,

4    Facebook argues that recipients were sent text messages "only after a number of people using

5    Facebook took a series of steps: a previous holder of Plaintiff's telephone number signed up for

6    Facebook, entered a phone number, made friend connections, those friends posted recent updates,

7    and the person whose Facebook account was associated with Plaintiff's phone number did not post

8    anything to Facebook in a given time. The affirmative choices by these people are what triggered the

9    message." (Mot. at 13.) This argument misses the mark for multiple reasons.

10        First, this argument would require the Court to apply a "but-for type of analysis which

11   focuses on the triggering event leading up to the offending text" that is "inconsistent with the July

12   2015 FCC instruction to apply a case-by-case analysis to how the human intervention element

13   applies to a particular type of equipment." *See Sherman*, 150 F. Supp. 3d at 1218-19. If it were

14   accepted, then every text message would be the result of human intervention, because someone had

15   to build the machine, turn it on, either input numbers or allow others to input them, and allow for the

16   transmission of text messages. In other words, "a person will always be a but-for cause of any

17   machine's action" and thus "the FCC's 'human intervention' gloss on the statute requires more than

18   but-for causation." *Id.* at 1219 (citation and quotation omitted). Facebook's argument also fails

19   because it suggests that a person's "affirmative choice" to not post on Facebook is a triggering event.

20   But an affirmative choice is the *opposite* of passive inaction (i.e., Plaintiff not updating a Facebook

21   account that doesn't belong to her), and an individual should not be allowed to be barraged by text

22   messages because they didn't act—the whole point of the TCPA is to protect such unsolicited

23   messages. Finally, Facebook's argument, again, ignores the FCC's 2015 Order, which declined to

24   create a "human intervention test by clarifying that a dialer is not an autodialer unless it has the

25   capacity to dial numbers without human intervention," *Id.* ¶ 20, which itself is "a case-by-case

26   determination." *Id.* ¶ 17; *see also Sherman*, 150 F. Supp. 3d at 1217.

27        The FCC's order and common sense aside, the holding in *Nunes v. Twitter, Inc.* is

28   particularly instructive as it relates to so-called human intervention for text messages sent to recycled

numbers. *See Nunes*, 2016 WL 3660526, at *3. In *Nunes*, Twitter users could sign up to receive tweets via text message on their cell phones, but—like here—new owners of recycled numbers who may not have Twitter accounts were "receiving uninvited text messages from Twitter containing tweets that the previous holder of the cell phone number had signed up for." *Id.* at *2. While the *Nunes* Court agreed there may be human intervention where an app user makes the "affirmative choice" to use a mobile app to send or receive text messages, and in such scenarios those messages would be "specific" to the persons receiving them:

> [W]hen the new owner of a recycled number is receiving tweets via text message, the former owner of the number is not "placing" any "specific" calls to her. He can't be, because he likely doesn't know when (or even if) the person whose tweets he signed up to receive via text message will compose a tweet. Nor does he know, once he relinquishes his number, to whom (if anyone) new text messages will be sent.

*Id.* at *3.[8]

Just like in *Nunes*, Holt and the class members here received text messages from Facebook regarding a different person's account on recycled numbers—despite having never provided consent, often having no involvement on the platform, and the previous owner's lack of knowledge as to "when (or even if) the [friend she chose to follow] will [post a status update on Facebook]." *See id.* at *3. The only reason they ever received text messages was because Facebook sought to increase their interaction with the platform and its revenue, not because of any affirmative choice the recipients made. Thus, because Holt alleges that Facebook sent the messages using equipment that stored cellular telephone numbers in a database that (i) dialed them without any human intervention and/or (ii) had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, (FAC ¶ 60), and "that the message[s were] sent *en masse* to a host of persons nationwide, and…from a short code," she has "sufficiently alleged the use of an [autodialer]." *See Harnish*, 2015 WL 1064442, at *3. Accordingly, Holt's TCPA claim should survive.[9]

---

[8]    In *Nunes*, the use of an ATDS was not at issue, likely because it was clear that one was used. Rather, on motions for summary judgment, the parties disputed whether Twitter was the "maker" of the messages so as to give rise to TCPA liability. *Nunes*, 2016 WL 3660526, at *3. In deciding that issue, the court focused on human intervention, which is relevant to Facebook's argument here.

[9]    Again, the cases relied upon by Facebook require no different result, as they predominantly focus on text messages that were immediately sent after an individual added a telephone number or

---

## B.     The TCPA Does Not Violate the First Amendment.

Perhaps recognizing that its arguments related to the sufficiency of Holt's TCPA claim must fail, Facebook last argues for its dismissal on the ground that the law violates the First Amendment both on its face and as applied to Facebook's conduct here.[10] To succeed on its facial challenge, Facebook must demonstrate that "'no set of circumstances exists under which the Act would be valid,' *i.e.*, the law is unconstitutional in all its applications." *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).[11] This is "the most difficult challenge to mount successfully." *Salerno*, 481 U.S. at 745. To succeed on its as-applied challenge, Facebook must show that application of the TCPA in these circumstances would violate the First Amendment. *See Legal Aid Servs. of Ore. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010).

In addition to the inherent difficulty of making such challenges, Facebook must climb a particularly steep hill here. Indeed, though Facebook's argument against the constitutionality of the TCPA appears to accept the validity of the rules and makes this an argument of last resort, it seeks to have this Court determine the validity of the statute on rules promulgated by the Federal Communications Commission ("FCC") that implement the statute. (Mot. at 17-18.) The law, however, makes clear that district courts lack jurisdiction to "enjoin, set aside, suspend (in whole or in part), or to determine the validity of" such statutes. 28 U.S.C. § 2342(1); *Cf. Cutting v. City of*

in direct response to a consumer's communication. *See Weisberg v. Stripe, Inc.*, No. 16-cv-00584, 2016 WL 3971296, at *4 (N.D. Cal. July 25, 2016) (allegations "suggest[ing] that [defendant's] text messages were sent to an individual user of its checkout service and in response to a direct communication from Plaintiff."); *McKenna v. WhisperText*, No. 14-cv-00424, 2015 WL 428728, at *4 (N.D. Cal. Jan. 30, 2015) (plaintiff alleged "the need for human intervention by a Whisper App user when sending an SMS invitation."); *Gragg v. Orange Cab Co., Inc.*, 995 F. Supp. 2d 1189, 1194 (W.D. Wash. 2014) (taxi cab driver had to press button to send text message after individual requested a ride).

[10]     Although Facebook argues that the TCPA should be struck down in its entirety, only § 227(b)(1)(A) is at issue. The junk-fax and do-not-call provisions have no bearing on this matter.
[11]     In the First Amendment context, a litigant might also raise a facial challenge on the grounds that a "substantial number" of a given law's applications are unconstitutional. *See id.* at 449 n.6 (quoting *New York v. Ferber*, 458 U.S. 747, 769-71 (1982)). Facebook's challenge, however, does not sound in the overbreadth doctrine: Despite describing the TCPA as "broad," Facebook identifies no instances of actual overbreadth, focusing its fire instead on the law's supposedly content-based regulation. *See N.Y. St. Club Ass'n v. City of New York*, 487 U.S. 1, 13-14 (1988) (rejecting argument that law "is invalid in all of its applications" and declining to entertain an overbreadth challenge because challenger had not sufficiently identified any instances of actual overbreadth).

*Portland*, 802 F.3d 79, 84 (1st Cir. 2015) (noting a court must disregard "authoritative construction" of a law if doing so would "make that law more vulnerable to constitutional challenge"). Facebook's argument is thus little more than an attempt to undo FCC regulations through the backdoor, an option foreclosed by § 2342.

That issue aside, Facebook's argument proceeds, essentially, in three steps. First, it argues that its unlawful texts are not "commercial speech," because they do not "propose a commercial transaction." (Mot. at 15.) Second, by virtue of two of the law's three exceptions—for emergency calls and for calls to collect debts owed to the United States—Facebook asserts that the TCPA is "plainly content-based" and thus subject to strict scrutiny. (Mot. at 17.) Third, Facebook concludes that the TCPA cannot survive that scrutiny because it is both over- and under-inclusive. (Mot. at 19-20.) Facebook misses the mark at every step.

### 1.     Facebook's text messages plainly constitute commercial speech.

First, contrary to Facebook's disagreement with the facts alleged, the text messages here plainly constitute commercial speech. Facebook argues that commercial speech is only speech that "propose[s] a commercial transaction," (Mot. at 15), but "the test for commercial speech is not so lacking in nuance" that it fails to cover speech like Facebook's. *Charles v. City of Los Angeles*, 697 F.3d 1146, 1152 (9th Cir. 2012). Courts apply three factors to determine whether speech is commercial: (1) whether the speech was an advertisement; (2) whether it referenced a specific product; and (3) whether the speaker had an economic motive. *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–68 (1983). No single factor is dispositive or necessary. *See id.* at 66-67 & n.14.

Facebook's text messages clearly constitute commercial speech. Not only do they highlight its most important commodity, a user's account, but they are also economically motivated because they are intended to cause consumers to interact with and more regularly use Facebook in order to drive advertising revenue. (FAC ¶¶ 12-16.) Courts have consistently found that speech of this nature constitutes commercial speech. *See, e.g.*, *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 865 (N.D. Cal. 2015) (Tigar, J.) (concluding information on a receipt was commercial because it ultimately aimed to "influence [them] to use the service again"); *Heartland Payment Sys., Inc. v. Mercury Payment Sys., LLC*, No. 14-cv-0437, 2014 WL 5812294, at *6 (N.D. Cal. Nov. 7, 2014)

(finding "monthly statements could induce merchants to continue using Mercury's services, and hence could be considered commercial speech designed to propose a continued business relationship"); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222, 1250–52 (N.D. Cal. 2014) (deciding that e-mails, which did not propose a particular transaction but referenced a product and were designed to increase defendant's user base, were economically motivated and commercial in nature).

Because Facebook's text messages are commercial speech, application of the TCPA in this case is assessed under the framework set forth in *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563-64 (1980), which asks first whether the regulated speech is truthful, and, if it is, whether the regulation reasonably advances a substantial government interest. *See id.* Not surprisingly, Facebook does not argue that the TCPA fails the *Central Hudson* test, as its text messages are not the kind of truthful message that even receives First Amendment protection— Holt is suing about messages sent to her about *someone else's* account. (FAC ¶¶ 20, 46.) Facebook's message that Holt's friends have "posted 7 updates this week" is the kind of misleading speech that undeniably flunks the first part of the *Central Hudson* test. But even if it were truthful, the Ninth Circuit has repeatedly held that the TCPA passes muster under intermediate scrutiny.[12] *See Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 876-77 (9th Cir. 2014); *Moser v. FCC*, 46 F.3d 970, 973 (9th Cir. 1995); *see also Destination Ventures, Ltd. v. FCC*, 46 F.3d 54, 56 (9th Cir. 1995) (upholding separate portion of the TCPA under *Central Hudson*); *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1011-12 (N.D. Ill. 2010) (applying *Central Hudson* to text message advertisement and upholding the constitutionality of the TCPA).

As a result, there is no question that the text messages at issue are "commercial" speech.

### 2.    The TCPA is not a content-based regulation.

Next, Facebook's contention that the relevant portion of the TCPA is a content-based regulation is at odds with a wealth of precedent, including case law that binds this Court. *See Gomez*, 768 F.3d at 876-77; *Moser*, 46 F.3d at 973; *Wreyford v. Citizens for Transp. Mobility, Inc.*, 957 F. Supp. 2d 1378, 1380-82 (N.D. Ga. 2013); *Abbas v. Selling Source, LLC*, No. 09-cv-3413, 2009 WL

---

[12]    Facebook notably does not so much as hint that the TCPA would fail inspection under the rubric of "intermediate scrutiny."

1    4884471, at *7 (N.D. Ill. Dec. 14, 2009). *Wreyford* is particularly instructive on this point. The court

2    there specifically recognized (i) that 47 U.S.C. § 227(b)(1)(A) regulates "any call," and is therefore

3    facially content neutral, (ii) that the law was sufficiently narrowly tailored to protect Congress's

4    asserted interest (consumer privacy), and (iii) that multiple alternative means of communication

5    remained open to convey the types of messages that could be conveyed through autodialed phone

6    calls or robocalls. *Wreyford*, 957 F. Supp. 2d at 1380-82.

7         Despite this clear precedent, Facebook contends that these decisions must be reconsidered in

8    light of *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015), which held that the inquiry into

9    whether a law regulates speech based on content must look first to the face of the statute. (Mot. at

10   16.) *Reed*, however, did not purport to radically alter First Amendment jurisprudence; it was firmly

11   grounded in precedent. In any event, Facebook doesn't (and couldn't reasonably) contend that *Moser*

12   is "clearly irreconcilable" with *Reed*, which is required for this Court to depart from that decision.

13   *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

14        In any case, *Moser* is in line with other authority that plainly survives *Reed*, namely *Bland v.*

15   *Fessler*, 88 F.3d 729 (9th Cir. 1996), which upheld a California law banning certain autodialed calls,

16   much like the TCPA, against a First Amendment challenge. The California law generally prohibited

17   use of an autodialer, but contained a few exceptions. Some exceptions, like allowances for calls

18   made with prior consent or to individuals with whom the caller had a preexisting relationship, were

19   content neutral. *Id.* at 733. Other exemptions were content-specific: "The statute exempts calls 1)

20   from schools to parents regarding student attendance, 2) from cable and utility companies to

21   customers regarding previously arranged installation of facilities, 3) from petroleum, chemical, and

22   nuclear facilities concerning emergencies, and 4) from police and fire officials concerning public

23   safety and emergencies." *Id.* at 734. The court first noted that "all of these exemptions are based on

24   relationships implying consent to receive [autodialed] calls," i.e., that they are merely specific

25   instances of a content-neutral exemption. *Id.* at 734. And rejecting the argument that "these

26   exemptions improperly privilege some relationships over others," the court held that

27   "[u]nderinclusiveness of the emergency exemptions cannot possibly indicate a preference for one

28   side of a debate over the other." *Id.* In other words, because the seemingly content-based exemptions

could be justified as applications of a content-neutral exemption, the law remained content neutral.

*Bland* counsels strongly in favor of concluding that the TCPA is content neutral. In fact, the exemptions highlighted by the Ninth Circuit in *Bland* mirror, with one exception, the exemptions that Facebook complains now render the TCPA unconstitutional. (See Mot. at 17-18.) Like the statute in *Bland*, the TCPA is a consent statute, with an allowance for calls related to emergencies. *See also Reed*, 135 S. Ct. at 2231 (assuming that safety is a compelling governmental interest); *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 817 (1984) (concluding that eliminating hazards was sufficient interest to uphold sign ordinance). The remaining exemption, for calls to collect on debt owed to the United States, simply regulates government speech, whether made by or on behalf of the government. *See* 47 U.S.C. § 227(b)(1)(A)(iii); *cf. Silver v. Penn. Higher Edu. Assistance Agency*, No. 14-cv-0652, 2016 WL 128629, at *4 (N.D. Cal. Mar. 31, 2016) (calls placed regarding federally funded student loans fell within this exemption to the TCPA; *Rust v. Sullivan*, 500 U.S. 173, 192 (1991) (providing federal funds amounts to government speech). Government speech, of course, is unrestricted by the Free Speech Clause. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009).[13]

The Ninth Circuit's approach in *Bland* is consistent with that of other circuits. For instance, the Eighth Circuit upheld a similar Minnesota telemarketing law, which banned unconsented-to autodialed calls except for "messages to subscribers with whom the caller has a current business or social relationship; messages from schools for parents, students, or employees; and messages to employees advising them of work schedules." *See Van Bergen v. Minnesota*, 59 F.3d 1541, 1550 (8th Cir. 1995). Rejecting the argument that the law's exceptions rendered it content-based, the court reasoned that "[t]he exceptions exempt certain groups from the restrictions, not on the basis of the content of their message, but on the basis of their relationship with the subscriber." *Id.* Moreover, the court held, "the exceptions also all rest on a single premise: that the caller has a relationship with the

---

[13]     Facebook also highlights the exemption for "medial appointment reminders." (Mot. at 17.) That exemption was created by the FCC under its authority to exempt from liability calls that do not infringe upon the privacy interests protected by the statute. *See* 47 U.S.C. § 227(b)(2). Crucially, though, this exemption is not an interpretation of any of the TCPA's text. So quite apart from the problem highlighted above, it makes no sense to say that the TCPA is content-based on its face on the basis of an exemption that exists separate and apart from the law's actual text. *Cf. Reed*, 135 S. Ct. at 2227.

subscriber implying the subscriber's consent to receive the caller's communications." *Id.* Because the specific exceptions were merely instances of the general, content-neutral exception for calls made with the called party's consent, the exemptions did not render the law content-based. *Id.* at 1550-51.

As another court recently recognized, *Bland* and *Van Bergen* survive *Reed. See Patriotic Veterans, Inc. v. Indiana*, --- F. Supp. 3d ---, 2016 WL 1382137, at *3 (S.D. Ind. Apr. 7, 2016). Facebook pushes back by pointing to *Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015), which along with another case, *Gresham v. Rutledge*, --- F. Supp. 3d ---, 2016 WL 4027901 (E.D. Ark. July 27, 2016), struck down state telemarketing laws under *Reed*. But those laws were notably different: they banned telemarketing and political robocalls, rather than robocalls generally. *See Cahaly*, 796 F.3d at 402; *Gresham*, 2016 WL 4027901, at *1. Not only were these courts troubled by the laws' regulation of political speech, *Cahaly*, 796 F.3d at 406; *Gresham*, 2016 WL 4027901, at *3, but by singling out for prohibition two types of calls the laws were plainly content-based in a way that the TCPA, which generally prohibits *all* calls made with an ATDS, is not. *See Cahaly*, 796 F.3d at 405; *Gresham*, 2016 WL 4027901, at *3. *Cahaly* simply does not bear the weight Facebook places on it.

In the end, the TCPA is not a content-based regulation.

**3.    The TCPA survives both intermediate and strict scrutiny.**

Because under binding precedent § 227(b)(1)(A) is a content-neutral regulation, it is subject only to intermediate scrutiny, which the Ninth Circuit has already held the TCPA survives. *See Gomez*, 768 F.3d at 876-77; *Moser*, 46 F.3d at 973. Facebook, of course, does not argue that these decisions were wrong. But even granting, for the sake of argument, Facebook's premise that the TCPA is subject to strict scrutiny, the law still passes muster. As Facebook recognizes, a law survives strict scrutiny if it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Wolfson v. Concannon*, 811 F.3d 1176, 1181 (9th Cir. 2016) (en banc) (quotation omitted). Though a demanding inquiry, strict-scrutiny review is not fatal. *See, e.g.*, *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015). Facebook does not dispute that the TCPA furthers a compelling interest in consumer privacy. (Mot. at 19.) Instead, it suggests that the law is not narrowly tailored and attacks § 227(b)(1)(A) as both over- and under-inclusive. Those arguments are not persuasive.

As for the law's purported underinclusiveness, "the First Amendment imposes no

freestanding underinclusiveness limitation." *Williams-Yulee*, 135 S. Ct. at 1668. As *Williams-Yulee* made clear, underinclusiveness is problematic only when it suggests that the government is not actually pursuing the interest it invokes. *Id.* That is not a problem here: the TCPA prohibits all calls placed using dialing equipment that Congress found to facilitate invasions of privacy, Pub. L. No. 102-243, § 2(10), (13), and exempts narrow categories of calls where the caller and called party have a relationship that indicates that the phone call will not be invasive of privacy, 47 U.S.C. § 227(b)(1)(A). Even the further exemptions the law empowers the FCC to create advance the privacy interests protected by the statute. *Id.* § 227(b)(2)(B), (C). In other words, the entire statutory and regulatory scheme is trained on eliminating precisely the harms identified by Congress. Facebook suggests that the law is problematic because emergency notifications are just as invasive of privacy as Facebook's messages, but that conclusion is driven by Facebook's own self-serving (and conclusory) evaluation of the calls at issue. (Mot at 19.) Congress saw matters differently, and Facebook's subjective reweighing of Congress's findings does not undermine Congress's attempt to tailor the TCPA's prohibitory and remedial scheme.

Similarly, the law is not overinclusive. Facebook suggests that the TCPA is overinclusive because it "sweeps far beyond the concerns that motivated its passage." (Mot. at 19.) Not so. The TCPA was passed because "[e]vidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Pub. L. No. 102-243, § 2(10). A claim under § 227(b)(1)(A), like Holt's, requires a plaintiff to prove the defendant placed an "automated or prerecorded" call. The sweep of the law thus perfectly matches Congress's concerns.

Because the law is not overinclusive or underinclusive, the Court should likewise reject Facebook's argument that the TCPA violates the First Amendment on those bases.

### C.   Plaintiff States a Claim Under Both the Unlawful and Unfair Prongs of the UCL.

Facebook finally argues that Holt cannot state a claim for relief pursuant to the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq.* (Mot. at 21-23.) That argument likewise fails. The purpose of the UCL is "to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services," *Kasky v. Nike, Inc.*, 45 P.3d 243, 249 (Cal. 2002), and prohibits

"any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or

misleading advertising," Cal. Bus. & Prof. Code § 17200, with the "unlawful" and "unfair" prong

each providing a separate theory of liability. *Lozano v. AT&T Wireless Servs. Inc.*, 504 F.3d 718,

731 (9th Cir. 2007). The UCL's coverage is "sweeping, embracing anything that can properly be

called a business practice and at the same time is forbidden by law." *In re First All. Mortg. Co.*, 471

F.3d 977, 996 (9th Cir. 2006) (citation omitted).

Facebook raises three challenges to Plaintiff's UCL claim. First, it asserts that Plaintiff lacks

standing to sue under the UCL, as she has supposedly not "lost money or property" as a result of its

conduct. (Mot. at 21.) Next, it argues that Plaintiff did not plead a violation of the UCL's "unlawful"

or "unfair" prongs. (*Id.* at 22-23.) None of these challenges carries water.

### 1.    Plaintiff has standing to pursue her UCL claim because the text messages diminished the use, enjoyment, value, and utility of her cellular telephone and cellular telephone plan.

To assert a UCL claim, a plaintiff must have "suffered injury in fact and . . . lost money or

property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. A plaintiff has

standing when she is able to demonstrate (1) "a loss or deprivation of money or property sufficient to

qualify as injury in fact, i.e., *economic injury*," and (2) causation. *Kwikset Corp. v. Superior Court*,

246 P.3d 877, 885 (Cal. 2011) (emphasis in original). Facebook challenges whether Plaintiff has

established an economic injury, which merely requires that a plaintiff "have a present or future

property interest diminished," or "be deprived of money or property to which he or she has a

cognizable claim." *Id.* at 885-86. The amount of economic loss needed to show standing "is only so

much as would suffice to establish injury in fact," and a "specific, identifiable trifle of injury" will

do.[14] *Id.* at 886; *see also In re Google, Inc. Privacy Policy Litig.*, No. 12-cv-01382, 2013 WL

6248499, at *7 (N.D. Cal. Dec. 3, 2013) (lost battery life and bandwidth consumption constituted

---

[14]    The requirements for UCL standing were tightened in 2004 to prevent abuse by plaintiffs who had not actually "used the defendant's product or service, viewed the defendant's advertising, or had any other business dealings with the dealings of the defendant." *Brown v. Hain Celestial Grp., Inc.*, No. 11-cv-03082, 2015 WL 3398415, at *5 (N.D. Cal. May 26, 2015) (citation and internal quotations omitted). However, the changes "[j]ust as plainly preserved standing" for those—like Plaintiff—who "had lost money or property as a result of the defendant's unfair business practices." *Id.* (citation and internal quotations omitted).

---

economic injury); *Thomas v. Dun & Bradstreet Credibility Corp.*, 100 F. Supp. 3d 937, 947 (C.D. Cal. 2015) (depletion of cell phone minutes constituted economic injury); *Tyacke v. First Tennessee Bank, N.A.*, No. 16-cv-228, Dkt. 35 (C.D. Cal. Apr. 28, 2016) (finding allegations that "illegal calls have impaired the use of…phones through general wear and tear and the consumption of battery life and cellular minutes" are sufficient under the UCL as "courts have found 'diminution in the performance of an electronic device may constitute an injury in fact.'") (citation omitted). Economic injury often involves "a loss by the plaintiff without any corresponding gain by the defendant, such as, for example, a diminishment in the value of some asset a plaintiff possesses." *Kwikset*, 246 P.3d at 895.

Here, Holt specifically alleges that the text messages diminished her and the proposed class members' property interests by "consuming battery life and diminishing their use, enjoyment, and utility of their cellular telephones and cellular telephone plans." (FAC ¶¶ 75, 78.) As a result, her and the Class members' cellular phone plans are worth less when encumbered by unsolicited, repeated, and irrelevant spam text messages than they would be worth without them. *See Tyacke*, No. 16-cv-228, Dkt. 35 at 4; *see also* FTC, Text Message Spam, https://www.consumer.ftc.gov/articles/0350-text-message-spam (last visited Sep. 8, 2016) (noting unsolicited text messages "can lead to unwanted charges on your cell phone bill" and "slow cell phone performance"). Unsolicited text messages can also diminish a cellular telephone's battery life both for the charge used in receiving the text message and for its entire lifespan, as it only has a limited number of recharge cycles. (*See* FAC ¶ 75.) Although discovery will bear out the exact amount of value lost, Holt's allegations of injury are sufficient for standing. *See In re Google*, 2013 WL 6248499, at *7 (noting "unauthorized use of system resources can suffice to establish a cognizable injury" and collecting cases).

Facebook nevertheless challenges Holt's claims of injury, arguing that her allegations contradict any claim of economic harm and relying on cases—most of which are not controlling on this Court—that are easily distinguishable from the facts at hand. *See Pietzak v. Microsoft Corp.*, No. 15-cv-5527, 2015 WL 7888408, at *2 (C.D. Cal. Nov. 17, 2015) (finding "embarrassment and emotional harm" insufficient to confer standing); *Van Patten v. Vertical Fitness Grp., LLC*, 22 F. Supp. 3d 1069, 1080 (S.D. Cal. 2014) (finding plaintiff presented insufficient evidence at summary

judgment to show economic harm); *Drew*, 2016 WL 1559717, at *8 (finding plaintiff alleged "no facts showing he suffered economic harm"); *Olmos*, 2016 WL 3092194, at *4 (finding plaintiff's allegations showed only *de minimis* economic injury). But, here, Plaintiff alleges that Facebook's conduct interfered with her use of her cellular phone's resources—resources that she paid for. (FAC ¶ 78.) This is sufficient to show economic injury. *See In re iPhone Application Litig.*, 6 F. Supp. 3d 1004, 1014 (N.D. Cal. 2013) (finding allegations that defendant's conduct "taxed the phones' resources by draining the battery and using up storage space and bandwith" showed plaintiff had standing under the UCL sufficient to withstand summary judgment). Because Holt alleges specific and concrete economic injury—that the receipt of the messages diminished her phone's battery life, caused wear and tear to her phone, and reduced the utility of the phone and plan she had paid for (FAC ¶ 78)—she has "lost money or property" and therefore has standing to bring her claim under the UCL.

> ### 2.    Plaintiff states a claim under the UCL's "unlawful" prong because she has plausibly alleged violations of the TCPA.

With her economic injury in tow, Holt first adequately states a claim under the UCL's "unlawful" prong, which is predicated on her TCPA claim. "The unlawful practices prohibited by the UCL are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory or court-made." *Federico v. Overland*, No. 12-cv-2588, 2013 WL 5516187, at *22 (N.D. Cal. Oct. 4, 2013) (internal quotation omitted). This prong of the UCL treats violations of other laws as unlawful practices that are "independently actionable." *Id.*; *see also Hartless v. Clorox Co.*, No. 06-cv-2705, 2007 WL 3245260, at *3 (S.D. Cal. Nov. 2, 2007).

As described above, Plaintiff has stated a claim under the TCPA because she has plausibly alleged that Facebook used an ATDS to send her text messages despite not having prior express consent to contact her on her cell phone. (FAC ¶ 46.) Having alleged this predicate violation under federal law, Plaintiff has likewise pleaded that Facebook's conduct was unlawful under the UCL.

> ### 3.    Plaintiff states a claim under the UCL's "unfair" prong because the text messages violate the policies underlying the TCPA, and the harm they caused outweighs their benefits.

Plaintiff also sufficiently alleges her claim under the UCL's "unfair" prong. Cal. Bus. & Prof. Code § 17200. Unfairness is an "intentionally broad" standard, and "a practice may be deemed

1    unfair even if not specifically proscribed by some other law." *In re First All.*, 471 F.3d at 995

2    (citation and internal quotations omitted). California courts have developed two tests to determine

3    whether a business practice is unfair, both of which Facebook's text messages satisfy. The first test,

4    known as the balancing test, "examines whether the challenged business practice is immoral,

5    unethical, oppressive, unscrupulous, or substantially injurious to consumers and requires the court to

6    weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *In*

7    *re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014) (citation and internal

8    quotations omitted). Some courts, however, forego an examination of the challenged business

9    practice's immoral or unethical nature and only balance harm and utility. *See, e.g.*, *Rubio v. Capital*

10   *One Bank*, 613 F.3d 1195, 1204 (9th Cir. 2010); *In re Adobe*, 66 F. Supp. at 1226 n.12.

11          The FAC describes in detail how Facebook's business practices run afoul of federal law (e.g.,

12   the TCPA), and how the text messages invade consumers' privacy. No further allegations are needed

13   to show that this conduct is unfair under the UCL. *Murfitt v. Bank of Am. NA*, No. 13-cv-01182,

14   2013 WL 7098636, at *10 (C.D. Cal. Oct. 22, 2013) (finding allegations referencing violations of

15   federal guidelines sufficient to show unfair business practices under the UCL). Plaintiff has also

16   alleged that the injuries to her and other consumers—the diminished use, enjoyment, value, and

17   utility of their cell phones and cell phone plans, not to mention the repeated violations of privacy—

18   are not outweighed by the text messages' utility. (FAC ¶ 75.) Indeed, no matter how much prodding

19   Facebook attempts through its text messages, Holt and the putative class members—who haven't

20   requested the text messages—likely will not use the service. Such allegations are sufficient to

21   survive a motion to dismiss. *Thomas v. U.S. Bank Nat'l Assoc.*, No. 14-cv-2705, 2015 WL

22   12434361, at *6 (S.D. Cal. Nov. 20, 2015) (finding allegations of specific instances of unfair

23   conduct sufficient to state a claim under the unfair prong of the UCL).

24          Facebook argues to the contrary, concluding that the recipients are benefitted by its

25   "notification service," which it admits applies only to those Facebook users who actually *want* the

26   notifications, unlike Holt here. (*See* Mot. at 23.) It, however, provides no basis for that argument or

27   explains how individuals like Holt, who do not use Facebook, could be benefitted. But even if it did,

28   that argument presents a factual dispute inappropriate for resolution at the motion to dismiss stage.

*See In re Anthem, Inc. Data Breach Litig.*, No. 15-md-02617, 2016 WL 589760, at *22 (N.D. Cal. Feb. 14, 2016) ("Whether Defendants' public policy violation is outweighed by the utility of their conduct under the balancing test is a question to be resolved at a later stage in this litigation."); *In re Ferrero Litig.*, 794 F. Supp. 2d 1107, 1116 (S.D. Cal. 2011) (noting question of unfairness cannot be resolved on demurrer). Because Holt has alleged injuries to herself and the other recipients of Facebook's unlawful text messages, and those messages provide no countervailing benefit, her FAC satisfies the "balancing test" for "unfair" claims under the UCL.

The second test, known as the tethering test, is met when "the public policy which is a predicate to a consumer unfair competition action . . . [is] tethered to specific constitutional, statutory, or regulatory provisions." *In re Adobe*, 66 F. Supp. 3d at 1226. A plaintiff need not plead an actual statutory violation, but must show that the effects of the unfair conduct "are comparable to or the same as a violation of the law, or otherwise significantly threaten or harm competition." *Id.* at 1227 (citation omitted). Although courts are divided as to whether the tethering test applies to consumer actions, or whether it is only applicable between competitors, *see Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1170 (9th Cir. 2012), the standard is satisfied here.

Like her "unlawful" claim, Plaintiff's "unfair" claim is based on Facebook's alleged violation of the TCPA. It, however, is also based on the underlying policy of the TCPA—namely, that "Congress was trying to prohibit the use of ATDS to communicate with others by telephone in a manner that would be an invasion of privacy." *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009). As such, it is necessarily "tethered" to this statute and its underlying policies, *see, e.g.*, *Hartless*, 2007 WL 3245260, at *7 (finding unfairness claim "adequately tethered" to statutory violation where the UCL claim was based on violation of federal law), and her claim for violation of the UCL survives under the "unfair" prong as well.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff Christine Holt respectfully requests that the Court enter an Order (i) denying Defendant Facebook, Inc.'s motion to dismiss, (ii) ordering Defendant to

1   answer Plaintiff's First Amended Complaint, and (ii) providing such other and further relief that the

2   Court deems reasonable and just.[15]

3                                               Respectfully submitted,

4                                               **CHRISTINE HOLT**, individually and on
                                                behalf of all others similarly situated,

5

6   Dated: September 9, 2016                    By: /s/ Courtney C. Booth
                                                     One of Plaintiff's Attorneys

7                                               Stewart Pollock (SBN 301356)
                                                spollock@edelson.com
8                                               Edelson PC
                                                123 Townsend Street, Suite 100
9                                               San Francisco, California 94107
                                                Tel: 415.212.9300
10                                              Fax: 415.373.9495

11                                              Benjamin H. Richman (Admitted *Pro Hac Vice*)
                                                brichman@edelson.com
12                                              Courtney C. Booth (Admitted *Pro Hac Vice*)
                                                cbooth@edelson.com
13                                              EDELSON PC
                                                350 North LaSalle Street, 13th Floor
14                                              Chicago, Illinois 60654
                                                Tel: 312.589.6370
15                                              Fax: 312.589.6378

16

17                                              Stefan Coleman*
                                                law@stefancoleman.com
18                                              LAW OFFICES OF STEFAN COLEMAN, PLLC
                                                201 South Biscayne Boulevard, 28th Floor
19                                              Miami, Florida 33131
                                                Tel: 877.333.9427
20                                              Fax: 888.498.8946

21                                              * *Pro Hac Vice* admission to be sought

22                                              *Attorneys for Plaintiff Christine Holt and the Putative Classes*

23

24

25

26   ───────────────────
     [15]     If the Court finds Holt's claims are insufficiently pleaded, she respectfully requests leave to
27   add further detail, or otherwise take such steps necessary to cure any defects found by the Court. *See,*
     *e.g.*, *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995) (leave to amend should be granted,
28   unless it is clear that the complaint cannot be cured by the allegation of different facts).

─────────────────────────────────────────────────────────────
PLAINTIFF'S OPPOSITION TO                   25        CASE NO. 3:16-cv-02266-JST
DEFENDANT'S MOTION TO DISMISS

1

## CERTIFICATE OF SERVICE

2

        I, Courtney C. Booth, an attorney, hereby certify that on September 9, 2016, I caused to be
served the above and foregoing ***Plaintiff's Opposition to Defendant's Motion to Dismiss First***
***Amended Complaint*** by causing a true and accurate copy of such paper to be filed and served on all
counsel of record via the court's CM/ECF electronic filing system, on this the 9th day of September,
2016.

3

4

5

                                   _____/s/ Courtney C. Booth_____

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28