UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTINE HOLT,<br><br>    Plaintiff,<br><br>    v.<br><br>FACEBOOK, INC.,<br><br>    Defendant. | Case No.16-cv-02266-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>Re: ECF No. 36 |

Before the Court is Defendant Facebook, Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). ECF No. 36. Plaintiff Christine Holt has filed an opposition. ECF No. 39. The Court will grant the motion in part and deny it in part.

## I.    BACKGROUND

For the purpose of deciding this motion, the Court accepts as true the following allegations from Plaintiff's First Amended Complaint ("FAC"), ECF No. 29. See Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).

Defendant Facebook, Inc. operates an online social network of more than 1.5 billion users. FAC ¶¶ 1, 12. Access to the social network is free, and Facebook relies almost exclusively on advertising to generate revenue. Id. ¶ 2. In order to increase the effectiveness of its advertisements, Facebook collects an array of personal information from its users, including their physical location, browsing histories, and telephone numbers. Id. ¶ 13. To promote user interaction with the platform, Facebook sometimes sends its users automated text messages encouraging them to post status updates. Id. ¶ 37-38. One of the most common text messages states: "What are you up to? Reply with a status update to post to Facebook . . . ." Id. ¶ 34. Another states: "Your friends have posted [a certain number of] updates this week. Reply to post

your own status on Facebook . . . ." Id. ¶ 35.

Plaintiff Christine Holt does not use Facebook. Id. ¶ 46. She did not provide her cellphone number to Facebook and did not authorize Facebook to contact her. Id. ¶ 47. Yet in March and April 2016, Holt received multiple text messages from unfamiliar numbers, asking her to post status updates to Facebook. Id. ¶ 44. Later she learned that the numbers were SMS short codes owned or operated by Facebook. Id. ¶ 43. She alleges that Facebook sent messages to her and to other new owners of recycled cellphone numbers.[1] Id. ¶¶ 19-20, 43-44. One of the messages Holt alleges that she received follows the template of one of the allegedly common automated messages, stating "Your friends have posted 7 updates this week. Reply to post your own status on Facebook . . . ." Id. ¶ 44. Finally, she alleges that Facebook does not provide a method for opting out of the text messages within the text messages themselves (by allowing users to reply "STOP," for example), and she cannot change the message settings of a Facebook account that does not belong to her. Id. ¶ 21.

On April 26, 2016, Holt filed her complaint against Facebook, alleging violations of the Telephone Consumer Protection Act ("TCPA"), and California's Unfair Competition Law ("UCL"). ECF No. 1. She seeks to represent the following two classes:

> Class 1 (the "No Consent" Class): All persons in the United States who: (1) received a text message call initiated by Defendant; (2) at his or her cellular telephone number; and (3) for which Defendant did not have any current record of prior express consent from him or her to place such text message calls at the time the text message calls were placed.
>
> Class 2 (the "Stop Text" Class): All persons in the United States who: (1) received a text message call initiated by Defendant; (2) at his or her cellular telephone number; (3) *after* making an express request to Facebook for the text messages to cease, other than a final one-time confirmation text message confirming the recipient's desire to not receive such messages.

Id. ¶ 51 (emphasis in original).

---

[1] The problem of recycled cellphone numbers has spurred a number of Telephone Consumer Protection Act lawsuits in this district. See, e.g., Nunes v. Twitter, Inc., No. 14-cv-02843-VC, 2016 WL 3660526, at *2 (N.D. Cal. July 1, 2016).

Facebook now moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). ECF No. 36. Holt has filed an opposition to the motion. ECF No. 39. The Court has jurisdiction over the TCPA claim of this action under 28 U.S.C. § 1331 and over the UCL claim under 28 U.S.C. § 1367.

## II.     LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While a complaint need not contain detailed factual allegations, facts pleaded by a plaintiff must be "enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the legal standard is not a probability requirement, "where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). The Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." Knievel v. ESPN, 393 F.3d 1068, 1072 (9th Cir. 2005).

## III.    ANALYSIS

Facebook argues that Holt's TCPA claim should be dismissed for two reasons. First, Facebook argues that Holt's factual allegations do not support an inference that Facebook used an automatic telephone dialing system ("ATDS"), which is an essential element of a TCPA claim. ECF No. 36 at 15-23. Second, Facebook argues that if the TCPA does prohibit its text messages, the Court must strike down the TCPA as "an unconstitutional content-based speech restriction, both on its face and as applied." Id. at 23-29. Finally, Facebook argues that Holt's UCL claim should be dismissed because she lacks standing and she fails to allege either an "unfair" or "unlawful" practice. Id. at 29-31.

### A. TCPA

#### 1. Elements of a TCPA Claim

To state a claim for a violation of the TCPA, a plaintiff must allege that "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." Meyer v. Portfolio Recovery Assocs., LLC, 707 F.3d 1036, 1043 (9th Cir. 2012); see 47 U.S.C. § 227(a)(1). Text messages are calls under the TCPA. Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 954 (9th Cir. 2009). An ATDS is "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). "[T]he statute's clear language mandates that the focus must be on whether the equipment has the *capacity* to store or produce telephone numbers to be called, using a random or sequential number generator." Satterfield, 569 F.3d at 951 (emphasis in original). Thus, "a system need not actually store, produce, or call randomly or sequentially generated telephone numbers, it need only have the capacity to do it." Id. "[D]ialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of 'autodialer') even if it is not presently used for that purpose, including when the caller is calling a set list of consumers." Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991, 30 FCC Rcd. 7961, 7971-72 (2015) ("2015 TCPA Order"); see also Nunes v. Twitter, Inc., No. 14-CV-02843-VC, 2014 WL 6708465, at *1 (N.D. Cal. Nov. 26, 2014) (explaining that an ATDS "appears to encompass any equipment that stores telephone numbers in a database and dials them without human intervention"). The "basic functions" of an ATDS are to "dial numbers without human intervention" and to "dial thousands of numbers in a short period of time." Id. at 7975. What constitutes human intervention requires a "case-by-case determination." Id.

Further, the Court acknowledges that it "is bound by the FCC's interpretations of the TCPA, unless those interpretations are invalidated by a court of appeals." Reardon v. Uber Techs, Inc., 115 F. Supp. 3d 1090, 1097 (N.D. Cal. 2015). The FCC has concluded that equipment without a present capacity to use a random or sequential number generator can still qualify as an ATDS. 30 FCC Rcd. at 7971-77. Equipment need only have a potential capacity, when paired

4

1  with certain software, to use a random or sequential number generator to qualify as an ATDS.  Id.

### 2. Holt Plausibly Alleges an ATDS

Holt alleges that Facebook sent the text messages "using equipment that stored cellular telephone numbers in a database and dialed them without any human intervention and/or that had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers, *en masse*."  ECF No. 39 at 12 (quoting FAC ¶ 60).  She alleges various details about the text messages she received and includes a screenshot of two text messages sent from Facebook's SMS short code 32665025.  FAC ¶¶ 43-44.  She argues that construing those facts in the light most favorable to her, the complaint "supports the reasonable inference that an ATDS was used."  ECF No. 39 at 16.

Facebook's first argument is that "conclusory allegations that Facebook used an ATDS . . . are not entitled to any weight."  ECF No. 36 at 17.  Although Holt's conclusory allegations regarding the capacity of Facebook's equipment, FAC ¶ 60, are "not, without more, sufficient to support a claim for relief under the TCPA," Duguid v. Facebook, Inc., No. 15-cv-00985-JST, 2016 WL 1169365, at *4 (N.D. Cal. Mar. 24, 2016), that does not resolve the question.  The question is whether, when "read as a whole, the complaint contains sufficient facts to show that it is plausible" that Facebook used an ATDS.  Kramer v. Autobytel, Inc., 759 F. Supp. 2d 1165, 1171 (N.D. Cal. 2010).  Because text message recipients have no way to deduce the specific type of dialing system a sender uses without discovery, courts allow TCPA claims to proceed beyond the pleading stage where plaintiff's indirect allegations about the messages "raise an inference that an [ATDS] was utilized."  Duguid, 2016 WL 1169365, at *4.  Such indirect allegations include "the content of the message, the context in which it was received, and the existence of similar messages."  Id. (citing Gragg v. Orange Cab Co., Inc., No. 12-cv-0576-RSL, 2013 WL 195466, at *3 n.3 (W.D. Wash. Jan. 17, 2013).  Conversely, these factors can also indicate the presence of human intervention that refutes the use of an ATDS.

#### a. Content of the Message

Where the content of the messages suggests that the defendant directly targeted a particular individual, that content weighs against an inference that the defendant used an ATDS.  See

Duguid, 2016 WL 1169365, at *5 (targeting particular Facebook account holder); Weisberg v. Stripe, Inc., No. 16-cv-00584-JST, 2016 WL 3971296, at *4 (N.D. Cal. July 25, 2016) (particular Stripe account holder); Flores v. Adir International, LLC, No. 15-cv-00076-AB-PLAx, 2015 WL 4340020, at *3-5 (C.D. Cal. July 15, 2015) (particular debtor identified by reference number). Conversely, where the content of the messages is impersonal advertisement, the content supports the inference that a defendant used an ATDS. See Kazemi v. Payless Shoesource, Inc., No. 09-cv-5142-MHP, 2010 WL 963225, at *2 (N.D. Cal. Mar. 16, 2010) (holding allegations of ATDS sufficient where content of the messages was advertisement scripted "in an impersonal manner"); Kramer v. Autobytel, Inc., 759 F. Supp. 2d 1165, 1171 (N.D. Cal. 2010) (same).

      Here, the parties agree that the messages contain some generic elements, such as encouraging the intended recipient to post status updates on Facebook. See ECF No. 36 at 17-18; ECF No. 39 at 14. Facebook says, however, the messages "are specific to activity relating to the account associated with Plaintiff's phone number," and target "the person whose Facebook account is associated with Plaintiff's phone number." ECF No. 36 at 17. Holt, in response, says that the content of the messages was "generic and boilerplate" and "formulaic." ECF No. 39 at 13. She says the messages were not "specific" because they "in no way identified the recipient," "weren't otherwise tailored for any one individual," and "could have been sent to every phone number associated with an account holder that had at least seven friends." Id. at 14.

      Holt has the better argument. First, certain of the alleged messages are completely generic. "What are you up to? Reply with a status update to post to Facebook . . . [,]" Compl. ¶ 34, is an impersonal message that Facebook could have sent to any of its billions of users. In other words, the content of this message contains no indication that it was sent "at the user's affirmative direction to recipients selected by the user." McKenna v. WhisperText, No. 5:14-cv-00424-PSG, 2015 WL 428728, at *4 (N.D. Cal. Jan. 30, 2015); see also Kramer, 759 F. Supp. 2d at 1171 (finding that advertisements written in an impersonal manner were consistent with an ATDS).

      The second alleged message — "Your friends have posted [a certain number of] updates this week. Reply to post your own status on Facebook . . . ." — presents a closer question. Compl. ¶ 35. Facebook is correct that one implication of this message's content is that Facebook tailored

6

the message to the account holder associated with Holt's phone number by filling in the number of that user's friends who had recently posted updates. But it is equally or more likely that the account merely crossed a threshold, set by Facebook's software, in which a user's Facebook friends posted a certain number of updates, triggering the sending of a text. To call this chain of events "human intervention" stretches the meaning of the phrase too far. And the universe of potential recipients expands further still if Facebook's software populates the "number of updates" field variably based on the number updates posted to each user's individual account.[2] If Facebook was changing the number of updates in each message to correspond to the recipient's user account, it could have sent text messages to something approaching its entire user base. In that scenario, Facebook would have "selected" the users only in the very broadest of senses.

The facts here are distinguishable from other cases where courts have found the content of a message indicative of human intervention. In Duguid, for example, the plaintiff received messages from Facebook stating "[y]our Facebook account was accessed from [internet browser] at [time]. Log in for more info." 2016 WL 1169365, at *1. This Court concluded that the messages did not support the inference that the texts were sent using an ATDS because their content "suggest[s] that Facebook's login notification text messages are targeted to specific phone numbers and are triggered by attempts to log in to Facebook accounts associated with those phone numbers." Id. at 5. In other words, the texts at issue in Duguid appeared to be triggered by a human act directly related to the specific user's account. By contrast, the seven status updates referenced in the message Holt received are only connected to the account associated with Holt's phone number insofar as Facebook decided to use that activity to encourage the account holder to post his or her own update. The difference between Duguid and Holt is also highlighted by the fact that Facebook could not have sent the login notification message to every one of its 1.5 billion users, as it could have the messages in this case.

Likewise, in Flores v. Adir Int'l, LLC, a debt collector messaged the plaintiff several times, asking him "to contact Defendant and providing a reference number." No. CV 1500076,

---

[2] In other words, for users whose accounts had received six friend updates, sending the same message that Holt received, but saying "six updates" instead of seven, and so on.

2015 WL 4340020, at *3 (C.D. Cal. July 15, 2015). The plaintiff even alleged that the defendant had "contacted him for the purpose of collecting on a specific debt." Id. at 5. Given these facts, the Court concluded that the defendant's "attempts to contact him were anything but random." Id. at 3. (quotations omitted). A reference number connected to a particular debt held by a particular debtor raises a much stronger inference of human intervention than does the number "7" in Facebook's message to Holt.

Finally, in Weisberg v. Stripe, Inc., the plaintiff received the following text from Stripe, a mobile payment processing company: "Thanks for saving your payment info! This number will be used to verify your identity at Registration and other sites using Stripe Checkout." No. 16-CV-00584-JST, 2016 WL 3971296, at *1 (N.D. Cal. July 25, 2016). When the plaintiff said "[w]ho is this?" Stripe replied, "[s]orry, we cannot receive messages at this number. If you need help, please contact support@stripe.com." Id. This Court concluded that the content of the first message suggested "Stripe's text messages are targeted to specific phone numbers in response to the voluntary release of a user's phone number when completing Stripe's checkout page." Id. Similarly, the Court found that the second message was likely a "targeted response to those individuals who respond to other text messages from Stripe." Id. In contrast, the content of Facebook's messages to Holt do not reflect the same kind of targeted response to a specific action by the account holder associated with her phone number.

Earlier this year, another court in this district found that Facebook plausibly used an ATDS when sending a similar type of text message to its users as the one Holt received here. Brickman v. Facebook, Inc., No. 16-CV-00751-TEH, 2017 WL 386238, at *2 (N.D. Cal. Jan. 27, 2017). In Brickman, Facebook had sent the plaintiff a message notifying him that it was one of his Facebook friend's birthdays, and encouraging him to post on that friend's wall. Id. at *1. The court concluded that, [w]hile Facebook's Birthday Announcement Texts do suggest direct targeting of Brickman, based on the facts alleged it is plausible that Facebook could have used an ATDS to send out the targeted messages." Id. at *3. The court listed the actions that could constitute human intervention—"Brickman signed up for Facebook; linked his cell phone number to his profile; befriended Mr. Stewart on Facebook, who himself entered his birth date; and then decided

8

to share that date with his Facebook friends"—and found that none of them showed that "a person order[ed] a specific system message." Id.  Rather, because Facebook allegedly "possessed the particular information and technology needed to craft such targeted messages (i.e., cell phone numbers, users' birthdays, friendship connections, etc.," use of ATDS was plausible. Id.  The same is true here.

"Every ATDS requires some initial act of human agency—be it turning on the machine or pressing 'Go.' It does not follow, however, that every subsequent call the machine dials—or message it sends—is a product of that human intervention." Johnson v. Yahoo!, Inc., No. 14 CV 2028, 2014 WL 7005102, at *5 (N.D. Ill. Dec. 11, 2014); see also Sherman v. Yahoo! Inc., 150 F. Supp. 3d 1213, 1217-1219 (S.D. Cal. 2015).  The content of Facebook's messages may indicate that Facebook decided to encourage its users to post by reminding them that their friends had recently done so, but it does not suggest that any human intervened to select Holt specifically to receive a message.  This factor weighs in favor of finding an ATDS.

### b. Context in Which the Message Was Received

Where a plaintiff receives a text message in the context of having "no reason to be in contact with the defendant," courts may draw support for the inference that an ATDS was used. See Drew v. Lexington Consumer Advocacy, LLC, No. 16-cv-00200-LB, 2016 WL 1559717, at *5 (N.D. Cal. Apr. 18, 2016).  In contrast, where the context indicates that the parties had some kind of pre-existing relationship or specific business with each other, courts draw the opposite inference.  See Flores v. Adir Int'l, LLC, No. 15-cv-00076-AB-PLAx, 2015 WL 4340020, at *3 (C.D. Cal. July 15, 2015).

Here, the context of the messages differs based on whether it is viewed from the perspective of Holt, the recipient, or Facebook, the sender.  Holt had no reason to be in contact with Facebook.  See FAC ¶¶ 46-47.  That context implies an ATDS.  See Drew 2016 WL 1559717, at *5.  Facebook, however, did have a pre-existing relationship with the person associated with Holt's phone number.  See FAC ¶¶ 19-21.  From Facebook's perspective then, the context in which the message was sent implies the opposite.  Cf. Flores, 2015 WL 4340020, at *3.  Of course, the explanation for this divergence is that Holt holds a recycled phone number.  See

United States District Court
Northern District of California

FAC ¶¶ 19-20, 43-44.

The Court finds that Plaintiff's perspective is the relevant one. For one thing, at the motion to dismiss stage the Court is required to construe all inferences in the Plaintiff's favor. Maya v. Centex Corp., 658 F.3d 1060, 1070 (9th Cir. 2011). For another, the context factor is stated in terms of whether the Plaintiff has "reason to be in contact with the Defendant," not the other way around. See Drew v. Lexington Consumer Advocacy, LLC, No. 16-cv-00200-LB, 2016 WL 1559717. The Complaint clearly alleges that Holt had no pre-existing relationship with Facebook based on which she would have expected to receive messages encouraging her to post status updates. That suggests Facebook used an ATDS.

In those rare cases where a court has found no ATDS despite the absence of a pre-existing relationship between the defendant and plaintiff, other contextual facts weighed in favor of a finding of human intervention. For example, in Glauser v. GroupMe, Inc., the plaintiff's friend added the plaintiff's phone number to an online group text messaging service, and he subsequently received a message from that service inviting him to join. No. 11-cv-2584-PJH, 2015 WL 475111, at *6 (N.D. Cal. Feb. 4, 2015). The Court held that the plaintiff's friend's activity constituted "human intervention," even though the plaintiff himself had never previously contacted the messaging service. Id. Here, by contrast, no friend of Holt's (or of the user associated with her account) requested that Facebook contact the number associated with Holt's account. Indeed, the seven friends referenced in Facebook's message likely had no idea Holt ever received a message at all. In other words, this is not a situation where targeted, specific behavior of a third party provides context for what otherwise appears to be the complete lack of a pre-existing relationship between Holt and Facebook.

On balance, the context of the messages is not suggestive of human intervention that would indicate the presence of an ATDS.

### c. Existence of Similar Messages

Where a plaintiff alleges that other people have also received similar unsolicited text messages, courts may draw support for the inference that an ATDS was used. Cf. Brown v. Collections Bureau of America, Ltd, No. 16-cv-00720-RS, 2016 WL 1734013, at *1-2 (denying

motion to dismiss where plaintiff alleged sixteen phone calls and "internet complaints by *other* persons about calls from the same phone numbers" (emphasis in original)).

The parties argue past each other on this issue. Facebook argues that the existence of similar messages <u>to the same person</u> "underscores that these were not en masse blasts . . . but rather messages targeted to a specific account . . . ." ECF No. 36 at 20. Holt argues that the existence of similar messages <u>to other people</u> suggests an ATDS: "there are numerous online complaints regarding the same boilerplate messages, which suggest[s] . . . an ATDS." ECF No. 39 at 15; <u>see</u> FAC ¶¶ 32-34 n.5. The Court agrees with Holt. Her allegations indicate that other users of recycled phone numbers are receiving similar unwanted messages from Facebook. <u>See</u> FAC ¶¶ 18-22, 32 ("why is this [unsolicited messaging] going on considering <u>this is a new [SIM card] and number</u> and I haven't even had a chance to give this new number out to my real life friends" (typographical errors corrected) (emphasis added)). This factor, too, weighs in favor of finding Facebook used an ATDS.

### d. Additional Relevant Allegations

Several additional factors weigh in favor of a finding that an ATDS was used. First, where a plaintiff alleges that the offending messages were sent via an SMS short code registered to the defendant, courts may draw support for the inference that an ATDS was used. <u>See</u> <u>Harnish v. Frankly Co.</u>, No. 5:14-CV-02321-EJD, 2015 WL 1064442, at *3 (N.D. Cal. Mar. 11, 2015). The parties agree that Facebook used an SMS short code to send the messages at issue in this case. ECF No. 39 at 16; ECF No. 40 at 13 n.5. They disagree about how much weight the Court should give an SMS short code in the analysis of whether an ATDS has been plausibly alleged. The Court agrees with Holt that short codes often indicate use of an ATDS, which bolsters the conclusions the Court has already drawn regarding the content and context of the alleged messages.

Second, unlike in other cases, there is no allegation here that any actual Facebook employee was involved in sending the messages Holt received. That sets this case apart from cases like <u>Luna v. Shac</u>, where the evidence showed that the plaintiff received a text message only after the defendant's employee "inputted telephone numbers into CallFire's web-based platform

either by manually typing phone numbers into the website, or by uploading or cutting and pasting an existing list of phone numbers into the website." 122 F. Supp. 3d 936, 940 (N.D. Cal. 2015), appeal dismissed (Nov. 20, 2015). In Luna, the employees' actions supported the court's finding that no ATDS was used. The opposite is true here.

### Conclusion: Holt Plausibly Alleged Use of an ATDS

All three Gragg factors imply the existence of an ATDS. Gragg, 2013 WL 195466, at *3 n.3. The content of the messages, especially the message "[w]hat are you up to? Reply with a status update to post to Facebook[,]" id. ¶ 34, is generic and impersonal. Holt had no pre-existing relationship with Facebook, and there are no allegations that any third party took any affirmative action that prompted Facebook to contact Holt. Finally, Holt alleged that others have complained of similar unwanted messages. Given these allegations, and Facebook's concession that the offending messages were sent via an SMS short code, it is plausible that Facebook used an ATDS to message Holt.

### 3. Constitutionality of the TCPA

Alternatively, Facebook argues that the TCPA is unconstitutional because it violates the First Amendment both on its face and as applied to the messages sent here. Although the Ninth Circuit has rejected a First Amendment challenge to the automated call provision of the TCPA, that case did not specifically address the constitutionality of the TCPA's exceptions. Gomez v. Campbell-Ewald Co., 768 F.3d 871, 876 (9th Cir. 2014).

Recently, however, the Brickman court rejected a nearly identical First Amendment challenge to the TCPA. 2017 WL 386238, at *4-9. The Court finds the logic of the Brickman decision persuasive and adopts it here.

#### a. Facial Challenge

Facebook first makes a facial challenge to the TCPA.[3] In Reed v. Town of Gilbert, the

---

[3] To evaluate this challenge, the Court need not determine whether Facebook's messages constitute commercial or non-commercial speech. What matters is that the TCPA, on its face, "regulates all automated telemarketing calls without regard to whether they are commercial or noncommercial." Moser v. F.C.C., 46 F.3d 970, 973 (9th Cir. 1995). Case law governing commercial speech is therefore irrelevant.

12

Supreme Court confirmed that "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." 135 S. Ct. 2218, 2226 (2015). In other words, the Court held that content-based laws are subject to strict scrutiny. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Id. at 2227. This includes "defining regulated speech by its function or purpose." Id. The Reed court then applied these standards to the Town of Gilbert's comprehensive sign code ("Sign Code"), which prohibited the display of outdoor signs without a permit, but exempted twenty-three categories of signs including ideological signs, political signs, and temporary directional signs. Id. at 2224. Because "[t]he signs restrictions in the Sign Code that apply to any given sign thus depend entirely on the communicative content of the sign," the Court held that the Sign Code was a content-based law subject to strict scrutiny. Id. at 2228.

The district court in Brickman concluded, and this Court agrees, that the TCPA is a content-based law subject to strict scrutiny under Reed. In Brickman, as here, Facebook argued that three exceptions to the TCPA are content-based. This Court agrees that at least two of the exceptions "would require a court to examine the content of the message that is conveyed in order to determine if a violation of the TCPA has occurred." Brickman, 2017 WL 386238 at *5. First, whether a text or call falls within the emergency exception, 47 U.S.C. § 227(b)(1)(A) (exempting any "call made for emergency purposes"), requires determining '[w]hether a call is 'necessary' in a situation affecting the health and safety of consumers," which "depend[s] on the content of the call, not just whether an emergency situation exists." Brickman, 2017 WL 386238 at *5. The TCPA's debt-collection exception also is content-based. 47 U.S.C. § 227(b)(1)(A)(iii) (exempting any call "made solely to collect a debt owed to or guaranteed by the United States"). Like in Brickman, this Court rejects the claim that the debt exception is "based on the called party's debtor-creditor relationship with the government, not on the content of the message." Brickman, 2017 WL 386238 at *6. "The plain language of the exception makes no reference whatsoever to the relationship of the parties." Id. The third exception Facebook challenges allows the FCC to

13

exempt calls made with an ATDS if the calls "are not charged to the called party" and are "in the interest of the privacy rights [the TCPA] is intended to protect." 47 U.S.C. § 227(b)(2)(C)). In response to the government's argument that the FCC orders implementing this exception are unreviewable, ECF No. 48 at 12-13, Facebook clarified that "[t]he problem is the statute, not the rulings" themselves. ECF No. 55 at 13. Given this concession, Brickman's analysis is again applicable here. The court explained that "[a]lthough the statute empowers the FCC to create exceptions that promote the interest of privacy rights, there are content-neutral ways for the FCC to accomplish this," including through exceptions based on the parties' relationships. Brickman, 2017 WL 386238 at *6. "The mere possibility that the FCC could create a content-based exception at some later time does not render this exception . . . content-based itself." Id. Because at least two of the TCPA's exceptions are content-based, the TCPA is subject to strict scrutiny under Reed.

The Court agrees with Brickman that the TCPA survives strict scrutiny because it "furthers a compelling interest and is narrowly tailored to achieve that interest." Reed, 135 S. Ct. at 2231. Facebook conceded for the purposes of this motion that promoting privacy, the state interest asserted by Holt and the government, is a compelling one. ECF No. 55 at 20; see also Carey v. Brown, 447 U.S. 455, 471 (1980) ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society."); Frisby v. Schultz, 487 U.S. 474, 484 (1988) (same); Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 775 (1994) (same); Florida Bar v. Went For It, Inc., 515 U.S. 618, 625 (1995) (same).

The next question is whether the TCPA is narrowly tailored. Facebook argues that the TCPA fails this test because 1) it is underinclusive, 2) it is overinclusive, and 3) "there are numerous less restrictive alternatives for protecting people from 'unwanted and intrusive' telemarketing calls." ECF No. 36 at 27-28. Again, the Court agrees with Brickman and rejects each of these arguments.

Facebook claims that the "TCPA's expansive exceptions render it 'hopelessly underinclusive,'" because calls or texts that would be allowed under the exceptions are just as intrusive to privacy as other calls. ECF No. 36 at 27. As an initial matter, although

14

"underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation.'" Williams-Yulee v. Florida Bar, 135 S. Ct. 1656, 1668 (2015). Nevertheless, in Reed, the Court determined that the Sign Code was underinclusive because it "sought to preserve the aesthetics of the town and to promote traffic safety by prohibiting outdoor signs without a permit," and yet it "provided twenty-three exceptions" that "allowed 'unlimited proliferation' of one type of sign while strictly limiting a different type of sign." Brickman, 2017 WL 386238 at *7. The TCPA is distinguishable. It is not, as Facebook claims, "riddled with exceptions"; rather, it contains "two exceptions, with the possibility for the FCC to set other exceptions in the future." Id. (explaining that, like here, Facebook did not challenge any of the FCC rulings issued under the third exception). Nor does the TCPA allow "unlimited proliferation" of any type of call. "Emergency calls by their statutory definition would only be allowed under limited circumstances, for a limited time, and for limited purposes," and "[t]he government debt exception would likewise be limited by the fact that such calls would only be made to those who owe a debt to the federal government." Brickman, 2017 WL 386238 at *7-8.[4] In sum, the TCPA's exceptions are limited, much more so than the Sign Code's exceptions in Reed, and do not do "appreciable damage" to the privacy interest underlying the TCPA. Reed, 135 S. Ct. at 2232.

Next, Facebook argues that the TCPA is unconstitutionally "overinclusive because it sweeps far beyond the concerns that motivated its passage." ECF No. 36 at 27. Specifically, Facebook complains that "Plaintiff seeks to apply the TCPA not to telemarketing calls made as part of an en masse blast to randomly or sequentially generated numbers, but to targeted status update notifications." Id. at 28. As an initial matter, the Court already concluded above, based on the allegations of Plaintiff's complaint, that Facebook's messages are not as targeted as Facebook claims. Further, "the TCPA does not restrict individuals from receiving any content they want to receive—speech that would otherwise be prohibited by the TCPA is immediately removed from

---

[4] Brickman also explains that even assuming the debt exception, newly added in 2015, were invalid, "it would not deem the entire TCPA to be unconstitutional because the exception would be severable from the remainder of the statute." Id. (citing INS v. Chadha, 462 U.S. 919, 931–32 (1983)).

the purview of the statute once express consent is provided." Brickman, 2017 WL 386238 at *8. Facebook has failed to show the TCPA is overinclusive.

Finally, Facebook argues that "there are numerous less restrictive alternatives for protecting people" from unwanted calls and texts, such as "time-of-day limitations, mandatory disclosure of the caller's identity, or do-not-call lists." ECF No. 36 at 28. These alternatives would not, however, "be at least as effective in achieving the legitimate purpose that statute was enacted to serve." Reno v. Am. Civil Liberties Union, 521 U.S. 844, 874 (1997). As the Brickman court explained:

> Time-of-day limitations would not achieve the same privacy objectives because even though such a restriction may designate the span of time in which callers can intrude on an individual's privacy, it would also designate a time for intrusive phone calls. Mandatory disclosure of a caller's identity and disconnection requirements would also not be as effective in achieving residential privacy because these would not prevent the privacy intrusion from the phone call in the first place. Do-not-call lists would also not be a plausible less restrictive alternative because placing the burden on consumers to opt-out of intrusive calls, rather than requiring consumers to opt-in, would obviously not be as effective in achieving residential privacy.

Brickman, 2017 WL 386238 at *8. The fact that the Fourth Circuit reached a different conclusion in Cahaly v. Larosa is not particularly meaningful because in that case, at summary judgment, the "government [ ] offered no evidence showing that these alternatives would not be effective in achieving its interest." 796 F.3d 399, 406 (4th Cir. 2015). Here, by contrast, the government raised arguments against each of the three alternatives that largely track the Brickman order. ECF No. 48 at 27-28. At the motion to dismiss phase, this is enough to plausibly show that the alternatives are not "at least as effective in achieving" the TCPA's purposes.

In sum, the Court concludes that the TCPA "furthers a compelling interest and is narrowly tailored to achieve that interest." Reed, 135 S. Ct. at 2231. Facebook's facial challenge fails.

**b.     As-Applied Challenge**

Facebook claims that the TCPA "violates the First Amendment on its face and as applied to status update messages." ECF No. 36 at 23. While "a facial challenge is a challenge to an entire legislative enactment or provision," an as-applied challenge is a challenge to "the application of the statute to a specific factual circumstance." Hoye v. City of Oakland, 653 F.3d

16

835, 857 (9th Cir. 2011).

The problem here is that Facebook does not actually make an as-applied challenge. Certainly, Facebook devotes several pages to arguing that its messages do not constitute commercial speech. ECF No. 36 at 23-24. But Facebook never actually claims that prohibiting its status update messages (even assuming they constitute non-commercial speech) is an unconstitutional application of the TCPA. All of Facebook's substantive analysis relates to its facial challenge. Id. at 24-29. Therefore, this constitutional attack on the TCPA fails as well.

**B.     UCL Claim**

Facebook argues that Holt lacks standing to bring a claim under California's Unfair Competition Law because she has failed "to state any facts suggesting that these messages caused any nontrivial *economic* harm." ECF No. 36 at 30 (emphasis in original). Although a violation of the TCPA by itself is enough to create standing under federal law, Van Patten v. Vertical Fitness Grp., LLC, 847 F.3d 1037, 1042 (9th Cir. 2017), the UCL has a "more limited standing requirement" than the general standing requirement for federal claims. Id. at 1048. To demonstrate standing under the UCL, "Plaintiffs must '(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2) show that that economic injury was the result of, i.e., *caused by*, the unfair business practice or false advertising that is the gravamen of the claim.' Kwikset Corp. v. Superior Court, 51 Cal. 4th 310, 322 (2011) (emphasis in original). "This economic injury requirement is 'more restrictive than federal injury in fact' because it encompasses fewer kinds of injuries." Van Patten, 847 F.3d at 1048-49 (quoting Kwikset, 51 Cal. 4th at 9).

In Van Patten, the Ninth Circuit found that plaintiff's receipt of an unwanted text was sufficient to confer Article III standing, but not enough to create standing under the UCL. The only economic injury plaintiff alleged was that he was required to pay for receiving defendant's text messages, but the evidence showed that his cell phone plan allowed unlimited messaging. Here, Plaintiff alleges that Facebook's text messages diminished her and the proposed class members' property interests by "consuming battery life and diminishing their use, enjoyment, and utility of their cellular telephones and cellular telephone plans." FAC ¶¶ 75, 78.

17

In analyzing this issue, district courts within this circuit have distinguished between conduct that draws upon the user's cell phone battery frequently or systemically – and which is therefore more likely to reduce battery life – and infrequent or episodic cell phone use that is likely to result only in a *de minimis* effect on the battery. The former is enough to allege injury under the UCL; the latter is not. Compare In re Google, Inc. Privacy Policy Litig., No. C-12-01382-PSG, 2013 WL 6248499, at *7 (N.D. Cal. Dec. 3, 2013) (one plaintiff downloaded 27 cell phone applications, and plaintiffs "specifically allege[d] a greater discharge of battery power as a result of unauthorized conduct and . . . the discharge [was] systemic rather than episodic"); Tyacke v. First Tennessee Bank, N.A., No. 16-cv-228, ECF No. 35 at 4 (C.D. Cal. Apr. 28, 2016); In re iPhone Application Litig., 6 F. Supp. 3d 1004, 1015 (N.D. Cal. 2013) (triable issue of material fact whether iPhone applications "drained" plaintiffs' batteries and used up storage space and bandwidth); with Olmos v. Bank of Am., N.A., No. 15-CV-2786-BAS-BGS, 2016 WL 3092194, at *4 (S.D. Cal. June 1, 2016) (*de minimis* reduction of battery life from receipt of two short text messages insufficient to confer standing); Hernandez v. Path, Inc., No. 12-CV-01515 YGR, 2012 WL 5194120, at *7 (N.D. Cal. Oct. 19, 2012) (finding that any depletion of mobile device's resources from a single application download was a *de minimis* injury for purposes of trespass claim).

It is impossible to tell from Plaintiff's conclusory allegations here into which of these two categories she falls. She states that Facebook's texts "consum[ed] battery life and diminish[ed] [class members'] use, enjoyment, and utility of their cellular telephones and cellular telephone plans," FAC ¶¶ 75, 78, but does not quantify the extent of the diminishment other than to say that she received "multiple text messages." Id. at ¶ 44. These allegations are not enough to plausibly allege that Plaintiff suffered the economic injury required for UCL standing. Accordingly, the Court will grant Facebook's motion as to Plaintiff's UCL claim with leave to amend.[5]

---

[5] In light of this conclusion, the Court need not reach Facebook's argument that Holt's "unfair" UCL claim fails because she has not alleged "significant harm that outweighs the utility of Facebook's notifications," ECF No. 36 at 30, or that Holt's "unlawful" UCL claim fails "because it is based on her failed TCPA claims." ECF No. 36 at 31. With regard to the second argument, however, the Court notes Holt's TCPA claim survives Facebook's motion to dismiss.

**CONCLUSION**

The Court denies Facebook's motion to dismiss Plaintiff's TCPA claim and grants the motion as to Plaintiff's UCL claim with leave to amend. Any amended pleading is due within 14 days of this order.

IT IS SO ORDERED.

Dated: March 9, 2017

_____
JON S. TIGAR
United States District Judge